## No. C-951

## The People of the State of Colorado v. Orlando L. Casias

(563 P.2d 926)

Decided April 11, 1977. Rehearing denied May 31, 1977.

J. D. MacFarlane, Attorney General, Jean E. Dubofsky, Deputy, Edward G. Donovan, Solicitor General, James S. Russell, Assistant, for petitioner.

Rollie R. Rogers, State Public Defender, James F. Dumas, Jr., Chief Deputy, Mary G. Allen, Deputy, for respondent.

*En Banc.*

MR. JUSTICE ERICKSON delivered the opinion of the Court.

We granted certiorari to review the decision in *People v. Casias*, 37 Colo. App. 343, 549 P.2d 803 (1976). We reverse and remand with directions to affirm the conviction of the defendant.

As reflected in the findings at the suppression hearing, and the testimony expressly found credible by the trial court, this case involves the following facts: In the fall of 1973, a special police task force was involved in a narcotics investigation which focused upon the premises occupied by the defendant, Orlando L. Casias. The police obtained a search warrant for the premises, based upon a reliable informant's report that the defendant had been selling heroin in his house within the preceding week. The affidavit supporting the warrant set forth that the police informant had identified the defendant's picture in a group of mug shots of different individuals. The defendant, according to the affidavit, had several prior narcotics arrests. Surveillance of the defendant's premises by the affiant during the preceding evening disclosed separate, brief visits by eight different persons. The trial court found that the affidavit did provide probable cause for issuance of the search warrant.

Armed with the warrant, Officers Cinquinta and Hollingshead waited for the defendant to come out of his house so that a search could be made. Officer Cinquinta testified that this procedure was required in order to prevent the defendant from destroying any narcotics inside the house. When the defendant appeared on the porch, Officer Cinquinta confronted the defendant with the warrant and began reading it to him. Both officers observed that the defendant had highly-constricted pupils, a lethargic speech and gait, and no odor of liquor on his person. The officers testified that in their opinion the defendant was under the influence of narcotics. According to the testimony of both officers, Casias then moved back suddenly, turned away, and placed his right hand into his right-front pants pocket.[1] Officer Cinquinta immediately grabbed the defendant and pulled his hand out of the pocket. He then reached with his own hand into the pocket. Feeling an object in the pocket, he pulled it out.[2] The object was a small tin-foil package. At this time, the officer opened the package and found two balloons. After the balloons were found, the defendant was formally arrested.

---

[1] Testimony at trial variously described the movements as "sudden," "quick," "evasive," "as to conceal his right side," and "to the effect of possibly pulling a weapon."

[2] The testimony of Officer Cinquinta differed from that of Officer Hollingshead, in that Officer Cinquinta stated that he pulled the defendant's hand out of the pocket and that the tin-foil package was in the defendant's hand. This conflict was not resolved by the trial court. For purposes of this case, we assume that the greater intrusion occurred and that Officer Cinquinta reached into the defendant's pocket.

The officers described the search as "incident to arrest." The balloons were placed in a vial. Subsequently, laboratory examination revealed that the balloons contained heroin. This evidence formed the basis for the defendant's conviction for the possession of heroin.[3] Execution of the search warrant on the premises led to the discovery of quantities of methadone and marijuana, and a "fixit" kit of heroin paraphernalia.

In reversing the conviction, the court of appeals held that, under any version of the facts that were favorable to the prosecution, the actions of Officer Cinquinta violated the defendant's Fourth Amendment rights. The court of appeals reasoned that by placing his hand in the defendant's pocket, the officer exceeded the scope of a proper investigatory frisk. Moreover, "even if the defendant brought the item out into the open in the palm of his hand when his hand was pulled from his pocket, the officer was not justified in seizing an item which he admitted was wrapped in tin-foil and could not have been contraband in 'plain-view.'" *People v. Casias, supra.* Based upon the facts in this case, we cannot agree with the conclusions of the court of appeals.

The issues presented by this case are (1) whether the frisk, in which we have assumed the officer reached into the pocket, exceeded the restraints of the Fourth Amendment and the Colorado Constitution, and (2) whether in any case the warrantless opening of the tin-foil package was violative of those restraints.

■ We note from the outset that both the frisk and the opening of the package were "searches" within the cognizance of the Fourth Amendment and Article II, Section 7 of the Colorado Constitution. We have repeatedly recognized the legitimacy of the privacy expectation which attaches to objects in sealed containers.[4] *See, e.g., People v. Counterman,* 192 Colo. 152, 556 P.2d 481 (1976) (sealed backpack); *People v. McPherson,* 191 Colo. 81, 550 P.2d 311 (1976) (paper bag); *People v. Branin,* 188 Colo. 235, 533 P.2d 1138 (1975) (tin-foil packet); *People v. Ware,* 174 Colo. 419, 484 P.2d 103 (1971) (foil-wrapped package).

■ The pockets of a person's clothing have, likewise, been uniformly recognized as areas to which a justifiable expectation of privacy attaches. *See, e.g., People v. Counterman, supra; People v. Taylor,* 190 Colo. 144, 544 P.2d 392 (1975); *People v. Martineau,* 185 Colo. 194, 523 P.2d 126 (1974); *People v. Navran,* 174 Colo. 222, 483 P.2d 228 (1971); *People v. Nefzger,* 173 Colo. 199, 476 P.2d 995 (1970) (jerking hand out

---

[3] Section 12-22-302, C.R.S. 1973.

[4] When a container is "sealed," but is nonetheless transparent so as to disclose its contents to the world, both the existence of a subjective expectation of privacy and the reasonableness of that expectation with regard to the container may be questionable. *Cf. People v. Nefzger,* 173 Colo. 199, 476 P.2d 995 (1970) (plastic bag of marijuana held to be evidence within plain view).

of pocket); *People v. Bueno*, 173 Colo. 69, 475 P.2d 702 (1970).

■ Finally, we note that a search conducted without a warrant is prima facie invalid, unless it falls within the limits of one of several well-recognized "exceptions" to the warrant requirement.[5] *See, e.g., People v. Willams*, 192 Colo. 249, 557 P.2d 399 (1976) (refusing to create new exception to the warrant requirement). Even within the scope of a given exception, the search must still meet the ultimate requirement of "reasonableness." *See, e.g., South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (inventory search); *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) (automobile); *Vale v. Louisiana*, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970) (probable cause plus exigent circumstances); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (stop-and-frisk); *People v. Counterman, supra* (inventory search); *People v. Gurule*, 172 Colo. 159, 471 P.2d 413 (1970) (stop-and-frisk). Of course, once an infraction of the Fourth Amendment occurs under the above standards, the provisions of the exclusionary rule become operative whenever the deterrent effect of the rule is justified.[6]

## I.

### The Stop-and-Frisk

This court, like virtually every court in the country, has struggled with the problems of consistency in applying the legal standards for "stop-and-frisk" or "investigatory stops" to the infinite variety of factual situations encountered by law-enforcement officers.[7]

---

[5] The proposition that a warrant, based upon a determination of probable cause by a detached and neutral magistrate, is the key index of reasonableness under the Fourth Amendment, save for a few "jealously and carefully drawn" exceptions, has been the consistent guide in search and seizure jurisprudence. *See, e.g., United States v. United States District Court*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). It has, likewise, been the prevailing perspective of this court. *See People v. Williams, supra.* We adhere to that principle with respect to *Colo. Const.*, Art. II, Sec. 7.

[6] The Supreme Court recently articulated a question as to whether the deterrent function of the exclusionary rule is furthered and should be continued when the fruits of the search are not within the "offending officer's zone of primary interest." *United States v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *see also Terry v. Ohio, supra* (exclusionary rule applies where "obtaining convictions is an important objective of the police"). The constitutional status of the exclusionary rule has recently been questioned in the context of the Fourth Amendment. *See Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Bivens v. Six Unknown Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Burger, C.J. dissenting); *cf. Brewer v. Williams*, 45 U.S.L.W. 4287 (U.S., March 22, 1977). We do not reach the issue of the status of the exclusionary rule under *Colo. Const.*, Art. II, Sec. 7. *See generally*, Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489 (1977); Miles, *The Ailing Fourth Amendment, A Suggested Cure*, 63 A.B.A.J. 365 (1977).

[7] Statutory authority exists in this jurisdiction for a limited stop, based upon a reasonable suspicion of criminal activity and a pat-down for weapons. *See* section 16-3-103, C.R.S. 1973. Under the facts of this case, however, the officers did not claim that they "reasonably suspected" that the defendant was engaged in any criminal activity as a basis for their confrontation with him. Accordingly, the statute is not directly involved in this case.

In *Terry v. Ohio, supra*, the Supreme Court recognized that the "police are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess." This need was balanced against the fact that "[I]t is nothing less than sheer torture of the English language to suggest that a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons is not a 'search.' " In resolving these interests, the *Terry* Court concluded that:

"[W]e deal here with an entire rubric of police conduct — necessarily swift action predicated upon the on-the-spot observations of the officer on the beat — which historically has not been and as a practical matter could not be subjected to the warrant procedure. Instead, the conduct involved in this case must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." (Footnotes omitted.)

 Finally, the *Terry* Court concluded that "reasonableness" must necessarily be based upon specific information rather than mere hunches:

"[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."

In applying the analysis of *Terry* to cases arising in this jurisdiction, we have predictably been faced with a variety of fact situations. Using the rubric of "reasonableness" in analyzing these factual circumstances, we have refined a series of guiding principles, most of which were expressed or implied in *Terry v. Ohio, supra*, or its companion case, *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

 First, there must exist some legitimate basis for making a "stop," or confronting the citizen in the first place. *See People v. McPherson, supra; People v. Branin, supra; People v. Burley*, 185 Colo. 224, 523 P.2d 981 (1974); *People v. Martineau, supra; Stone v. People*, 174 Colo. 504, 485 P.2d 495 (1971); *People v. Bueno, supra; People v. Severson*, 39 Colo. App. 95, 561 P.2d 373. Generally, such "stops" have been upheld only when they have been based upon some articulable suspicion that the citizen was recently engaged, or was about to engage in criminal conduct.[8] The stops were, thus, investigatory in nature

---

[8] Prior cases dealing with this aspect of stop-and-frisk situations have generated considerable division concerning the appropriate characterization of a given set of facts. *See People v. Taylor*, 190 Colo. 144, 544 P.2d 392 (1976) (6-1); *People v. Mathis*, 189 Colo. 534, 542 P.2d 1296 (1975) (6-1); *People v. Mullins*, 188 Colo. 23, 532 P.2d 733 (1975) (4-2-1); *People v. Cruz*, 186 Colo. 295, 526 P.2d 1315 (1974) (6-1); *People v. Montoya*, 185 Colo. 299, 524 P.2d 76 (1974) (4-2-1); *People v. Burley*, 185 Colo. 224, 523 P.2d 981 (1974) (6-1); *People v. Stevens*, 183 Colo. 399, 517 P.2d 1336 (4-2-1); *People v. Noreen*, 181 Colo. 327, 509 P.2d 313 (1973); *Stone v. People*, 174 Colo. 504, 485 P.2d 495 (1971) (6-1); *People v. Bueno*, 173 Colo. 69, 475 P.2d 702 (1970) (4-3). In no case, however, have we approved unguided police discretion or departed from the general principle that there must exist some legitimate basis for the stop beyond mere whim or unsubstantiated hunch. *See Terry v. Ohio, supra* (Harlan, J., concurring); *see also* section 16-3-103, C.R.S. 1973 ("reasonable suspicion" of criminal conduct required).

and based upon some specific information rather than a naked hunch. *Compare People v. McPherson, supra, and People v. Corbett,* 190 Colo. 388, 547 P.2d 1264 (1976), *with People v. Martineau, supra.* Cases have, however, recognized that other legitimate official purposes exist for brief detentions. *See Terry v. Ohio, supra* (assisting intoxicated person with no intention of arrest; mediation of domestic quarrel); *People v. Davis,* 39 Colo. App. 63, 565 P.2d 1347 (traffic control, accident investigation, rendering first-aid, assisting disabled motorist).[9]

Second, as a condition to the reasonableness of a frisk or pat-down of the citizen who is stopped, there must exist some specific facts in the citizen's reaction, or the circumstances surrounding the stop, which give the officer a rational basis for suspecting that the citizen may be armed. *See Finley v. People,* 176 Colo. 1, 488 P.2d 883 (1971); *People v. Navran, supra* (articulable factors in citizen's reaction to stop or in surrounding circumstances give rise to reasonable suspicion that the person is armed); *People v. Shackelford,* 37 Colo. App. 317, 546 P.2d 964 (1976). Balanced against this concern for a demonstrably rational basis for the frisk has, of course, been a recognition that these situations do not occur in an analytical vacuum. Officers are not required to precisely weigh their observations before acting for a protective purpose. The root function of the "articulable suspicion" requirement has not been to ham-string officers facing dangerous street situations. Rather, it has been to establish a basis for *post-hac* judicial review to insure that the weapons frisk is not used as a substitute for a search incident to arrest or as a means of evading the normal warrant and probable cause requirements of the state and federal constitutions. *See People v. McPherson, supra; People v. Corbett, supra; People v. Noreen,* 181 Colo. 327, 509 P.2d 313 (1973); *Finley v. People, supra; see also People v. Stevens,* 183 Colo. 399, 517 P.2d 1336 (1973).[10]

---

[9] Not every situation in which an officer casually asks a question of a person on the street is even to be considered a "stop" or "seizure" within the meaning of the Fourth Amendment. The distinction is one between an objective basis for the citizen's feeling that he is not free to walk away, and the simple query by an officer to a citizen who remains free to ignore the question and continue about his business. *See, e.g., Terry v. Ohio, supra* (White, J. concurring).

[10] The cases decided by this court have demonstrated the truth of the axiom that "[t]he test of reasonableness cannot be fixed by per se rules; each case must be decided on its own facts." *People v. Counterman, supra, quoting Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (Black, J. concurring and dissenting); *accord, Terry v. Ohio, supra; Sibron v. New York, supra. But see United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (full search of person incident to arrest is per se reasonable). Close fact situations may be especially difficult to analyze except on an *ad hoc* basis. *Compare People v. Branin, supra, with People v. Noreen, supra, and People v. Nefzger, supra.* On the other hand, invocation of the standard of "reasonableness" cannot be a means of dispensing with the responsibility of reconciling different fact situations under the same structural analysis. In no case have we expressly retreated from the general principle requiring specific justification for the frisk.

Third, when an officer legitimately confronts a citizen, and has an articulable and reasonable basis for suspecting that the citizen is armed, he may act to protect himself by conducting a limited search of the person's clothing.[11] *See People v. Navran, supra.* Generally, this amounts to a frisk or pat-down of the exterior of the clothing. Only when some reasonable basis for believing that a weapon may be contained in the clothing, or that an exterior frisk will not be availing in detecting some specific weapon, is the further intrusion of reaching *into* the pockets or other areas of clothing permitted. *Compare People v. Navran, supra* (no basis for further intrusion where only small lump in shirt pocket felt); *People v. Bueno, supra; People v. Shackelford, supra.* Again, the crux of this careful scrutiny of the weapons search is not to place the officer at a dangerous disadvantage, but to insure that the intrusion was truly based upon a protective purpose. We have condemned the nominal weapons search which, on the facts, can only have been aimed at procuring evidence. *See People v. Branin, supra; People v. Burley, supra; People v. Noreen, supra; Finley v. People, supra; People v. Navran, supra; People v. Shackelford, supra.* Stated in other terms, the permissible scope of the weapons search is limited by its purpose. *See People v. Corbett, supra; People v. Taylor, supra* (test is whether "scope of frisk is limited to that which is necessary to the discovery of weapons"); *People v. Branin, supra* (search not justified under *Terry* where it was a full-fledged exploratory search); *People v. Burley, supra* (brief search of car floorboard was one "in which the scope of the search was reasonably related to the officer's fear that the defendant might have a weapon concealed beneath the car seat.")

Finally, while the principles discussed above must not be mechanically imposed as rigid abstractions, they, likewise, cannot be ignored in given cases merely because of extraneous factual circumstances. The proper analytical method for evaluating stop-and-frisk cases abandons neither principles nor facts.

The facts of this case indicate that the actions of Officer Cinquinta did not violate the defendant's rights. There was a legitimate basis for initially confronting the defendant — the service of the search warrant. In *People v. Lujan,* 174 Colo. 554, 484 P.2d 1238 (1971), we analyzed the long-standing principle that, subject to certain well-defined exceptions, prior notice of the execution of a search warrant is required.

---

[11] Under certain circumstances, a limited, protective pat-down may also extend to other areas to which the suspect has access, such as a nearby backpack or clothing. *See People v. Brisendine,* 13 Cal.3d 528, 531 P.2d 1099, 119 Cal.Rptr. 315 (1975).

Officer Cinquinta correctly apprised the defendant that the officers were there to execute the search warrant.[12]

■ When confronted with two officers about to engage in a search of his premises, the defendant suddenly made a motion to place his hand in his pocket. What may objectively appear to be "furtive gestures" are, of course, a common occurrence when a citizen is suddenly confronted with policemen asking questions. Accordingly, we have given careful scrutiny to this claim as a basis for suspecting that the citizen may be armed. A mere "furtive gesture" alone is often insufficient:

"A mere furtive gesture is subject to such varied interpretations, that it would be folly to allow great weight to be afforded such actions *without more specific knowledge* on the part of the officer."

*People v. McPherson, supra* (emphasis added), *citing People v. Goessl*, 186 Colo. 208, 526 P.2d 664 (1974) ("It is normal for law-abiding persons, as well as persons guilty of criminal activity, to be nervous when stopped by a policeman for a traffic offense."). When the person has been detained upon a legitimate basis amounting to more than mere general suspicion, sudden movements in reaction to the confrontation may take on more significance. *See People v. Burley, supra* (upholding search of floorboard where defendant was repeatedly reaching down as officers approached pursuant to traffic stop); *People v. Martineau, supra* (suspect ran, then hid in prone position as officers approached); *Cowdin v. People*, 176 Colo. 466, 491 P.2d 569 (1971) (warrantless auto search invalidated, noting "we do not perceive a 'furtive' gesture, absent prior underlying information which would form a basis for probable cause to believe the defendant possessed narcotics, as being a proper standard."); *People v. Noreen, supra* (remanding for findings on frisk where police had no background information on suspect, but who made "unusual hand movements to his left rear pocket").

■ Under the facts of this case, the officers had abundant "background" information on the defendant's activities. In addition to the facts contained in the affidavit supporting the search warrant, there was undisputed testimony by Officer Cinquinta that he was familiar with the defendant's "rap sheet," which included prior charges of assault with a deadly weapon. In effect, the officers reasonably believed that they were telling a heroin dealer that he was about to be arrested. A sudden gesture "to the effect of possibly pulling a weapon" in that context was an ample

---

[12] The purpose of the "prior knock" rule is to secure the privacy of a residence against sudden and alarming police intrusions. Advising a citizen whose house is about to be searched pursuant to a warrant gives additional legitimacy to the procedure in the eyes of the citizen. Notice also provides a point where any error in the address or other details of the warrant can be determined. Finally, the citizen who is advised of the nature of the warrant can guard against invasions of privacy in excess of those authorized by the warrant. *See generally*, Annot. 70 A.L.R.3d 219 (1974).

basis for immediately taking protective action. *Compare People v. McPherson, supra* (absence of background information, no furtive gesture), and *People v. Corbett, supra* (same), *with People v. Martineau, supra* (suspicious presence of defendant earlier in evening near store break-in; defendant later ran and hid as officers approached at 4:00 a.m.).

Officer Cinquinta's protective response in pulling the defendant's hand out of his pocket and then reaching into it also was not unreasonable. He suspected not only that the defendant was armed, but that he was actually *reaching* for a weapon. In that situation, to politely conduct a formal, exterior frisk and risk the defendant again reaching into his pocket would have been to court the possibility of disaster. *See People v. Nefzger, supra* (defendant suddenly placed hands in pocket when advised that police would frisk him); *People v. Shackelford, supra* (". . . when the defendant was asked to put his hands to his sides, he turned his left hand away so that the officers could not tell what, if anything, the defendant was holding in that hand. This surreptitious reaction to the frisk caused the officers to worry that the defendant might be palming a weapon or contraband.").

## II.
## *The Search of the Package*

We have concluded that no constitutional violation had occurred prior to the seizure of the package. Likewise, in opening the package, without a warrant, we find that no constitutional infraction took place.

Like "furtive gestures," the appearance of "tin-foil packages" and similar containers is a common phenomenon in law-enforcement. We have repeatedly held, however, that the privacy interests attaching to such containers are not exempt from constitutional protection. As the court of appeals correctly noted in this case, the mere fact that a package is in plain view does not automatically warrant intrusion into its contents. *People v. Casias, supra; see People v. Counterman, supra; People v. Ware, supra; People v. Branin, supra; but see People v. Montoya, supra.* Nor does the *mere* fact that "tin-foil" packages often contain narcotics provide a basis for a warrantless intrusion. *Cf. People v. Olson,* 175 Colo. 140, 485 P.2d 891 (1971).

In this case, however, the record discloses that the officers possessed probable cause to place the defendant under arrest at the time the package was opened. Significant information relating the defendant to possession of narcotics was contained in the warrant affidavit which Officer Cinquinta had signed.[13] Moreover, the defendant was personally before them

---

[13] The affidavit recounted that: "[I]n the past seven days [the informant] has purchased heroin twice from a one Orlando 'Safety' Casias at 2417 Alcott Street. He further states that on both occasions Casias went into the kitchen to return with the heroin. The informant also states that he has witnessed Casias selling heroin from his vehicle . . . on two occasions in the last week . . . . In checking with [police department] files it shows that Casias has previous arrests for narcotics. A surveillance of 2417 Alcott on the evening of 10-27-73 disclosed eight seperate [sic] visitors who entered the house for a short period of time and then left on foot or in a vehicle."

in a condition which, based upon their experience as police officers, they reasonably concluded to be the result of the use of narcotics. Finally, the defendant had acted suspiciously when confronted by the officers, resulting in the discovery of the small package of the type often used to conceal drugs. When viewed as a totality, these facts would warrant a police officer, exercising reasonable caution, to conclude that the defendant was engaged in criminal activity — the possession of narcotic drugs. *See Finley v. People, supra; Stone v. People, supra.*

In our opinion, this search of the package was validly conducted as a search incident to arrest. First, it was not necessary that the defendant be immediately apprised that he was "under arrest." The key index of the reasonableness of the detention was the existence of *probable cause to arrest. See Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973); *cf. People v. Stevens, supra* (labels in search and seizure context are mere shorthand which should not be confused with underlying substantive analysis). For purposes of analyzing the search of the container, we treat this situation as one of "arrest" from the time the officers had probable cause to hold the defendant and charge him with a crime. As noted above, this occurred prior to the time the package was opened.

Second, the arrest without a warrant was proper, since exigent circumstances existed. The officers faced a suspect whom they had probable cause to believe was committing a crime. Moreover, they objectively faced the clearly exigent circumstances that, to understate the matter, the suspect knew that he was under heavy suspicion. *See Cupp v. Murphy, supra.* Finally, the police were not required to enter the defendant's house or other place where an expectation of privacy existed, in order to effect the arrest. These factors indicate the constitutional propriety of the warrantless arrest under even the strictest historical standards. *See United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) (Fourth Amendment may require more than probable cause when intrusion into residence occurs during arrest); *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (upholding warrantless arrest in public place); *People v. Hoinville*, 191 Colo. 357, 553 P.2d 777 (1976) ("exigency" required to excuse warrantless arrest based upon probable cause under Colorado law); *People v. Tangas*, 190 Colo. 262, 545 P.2d 1047 (1976) (same).

Third, the search of the container was not unreasonable. Once the package was in Officer Cinquinta's hand, it arguably was removed from the defendant's "zone of control" or "grabbing area." *See Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). However, when faced with a suspect who has *already* made one sudden movement with the apparent intent of reaching for the package, and who was

apparently under the influence of drugs, a rigid analysis of "grabbing area" seems distinctly out of place. This was not a general rummaging through the defendant's possessions under the pretext of a search incident to arrest. Rather, it was the opening of a small package which the officers clearly had probable cause to believe contained heroin, a highly evanescent substance. The possibility that, in the close quarters of the moment, the defendant could have suddenly grabbed the package away from the officer and either swallowed it or flung it away cannot be ignored. *See Finley v. People, supra* (defendant placed cellophane package in mouth). The reasonable "grabbing area" of the defendant, under these circumstances, focused upon the package in the officer's hand. *Compare People v. Burley, supra* (defendant reaching for object on floorboard of automobile).[14]

## III.
### The Warrantless Arrest

Our review of the face of the affidavit supporting the search warrant in this case indicates that prior to the time the officers confronted the defendant on the porch, the record reflects that they possessed probable cause to arrest the defendant for the sale of heroin. Section 16-3-102, C.R.S. 1973, states that a police officer "may arrest a person when: . . . (c) He has probable cause to believe that an offense was committed and has probable cause to believe that the offense was committed by the person to be arrested. *An arrest warrant should be obtained when praticable.*" (Emphasis added.) In *People v. Hoinville, supra*, we construed this language to mean that "when an adequate opportunity to obtain an arrest warrant exists, the police must obtain an arrest warrant." *Accord, People v. Hernandez*, 191 Colo. 554, 554 P.2d 291 (1976). In *Hoinville*, we relied upon the above statute to impose a higher standard than the federal constitutional minimum established in *United States v. Watson, supra* (warrantless arrest based upon probable cause and without exigent circumstances held proper).

The case before us presents an aspect of the statutory requirement which was not present in *People v. Hoinville, supra*, or *People v. Hernandez, supra*: must the police apply for an arrest warrant at the earliest period at which they *might possibly* have probable cause?

---

[14] We are cognizant that this warrantless inspection of the contents of the package could in any case have been summarily approved under the Fourth Amendment pursuant to the reasoning in *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); and *Gustafson v. Florida*, 414 U.S. 260; 94 S.Ct. 488, 38 L.Ed.2d 456 (1973). We have previously indicated disapproval of these cases in the context of minor traffic arrests. *See People v. Clyne*, 189 Colo. 412, 541 P.2d 71 (1975), *citing People v. Brisendine, supra* (disapproving *Robinson* and *Gustafson* in traffic stop context). While California appears to have adopted a piece-meal approach in applying these Supreme Court cases under their own constitution, *see People v. Maher*, 17 Cal.3d 196, 550 P.2d 1044, 130 Cal.Rptr. 508 (1976), we are not *necessarily* faced with application of these cases here. Accordingly, we do not further define the impact of these cases in the context of our constitution.

Mr. Justice Marshall, dissenting in *United States v. Watson, supra*, articulated some considerations relevant to this problem:

"The Government's assertion that a warrant requirement would impose an intolerable burden stems, in large part, from the specious supposition that procurement of an arrest warrant would be necessary as soon as probable cause ripens. There is no requirement that a search warrant be obtained the moment police have probable cause to search. The rule is only that present probable cause be shown and a warrant obtained before a search is undertaken. The same rule should obtain for arrest warrants, where it makes even more sense.

. . . .

"This sensible approach obviates most of the difficulties that have been suggested with an arrest warrant rule. Police would not have to cut their investigation short the moment they obtain probable cause to arrest, nor would undercover agents be forced suddenly to terminate their work and forfeit their covers. Moreover, if in the course of the continued police investigation exigent circumstances develop that demand an immediate arrest, the arrest may be made without fear of unconstitutionality, so long as the exigency was unanticipated and not used to avoid the arrest warrant requirement. Likewise, if in the course of the continued investigation police uncover evidence tying the suspect to another crime, they may immediately arrest him for that crime if exigency demands it, and still be in full conformity with the warrant rule. . . . Other than where police attempt to evade the warrant requirement, the rule would invalidate an arrest only in the obvious situation: where police, with probable cause but without exigent circumstances, set out to arrest a suspect." (Citations and footnotes omitted.)

 We find this reasoning persuasive and adopt it as a proper construction of our arrest warrant statute. As applied to the facts in this case, we find no violation of the defendant's rights under the statute. There is no basis here for suggesting that the police were attempting to evade the warrant requirement in this case. The exigency of actually finding the defendant in possession of heroin clearly was not anticipated, and the police carefully went through the procedure of securing a search warrant.

Accordingly, we reverse the court of appeals and remand with directions to affirm the judgment of the trial court.

MR. JUSTICE GROVES concurring in the result.