**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Thomas MACK, Defendant–Appellant.**

**No. 99CA1007.**

Colorado Court of Appeals, Div. III.

March 15, 2001.

Certiorari Denied Oct. 29, 2001. *

---

* Justice COATS does not participate.
  Chief Justice MULLARKEY would grant as to the following issue:
  Whether the court of appeals' decision in this case is inconsistent with the court's decision in *Outlaw v. People,* 17 P.3d 150 (Colo. Jan. 22, 2001), and whether the evidence should have been suppressed as the fruit of an illegal search and seizure.

Ken Salazar, Attorney General, Hugo Teufel, Assistant Attorney General, Denver, CO, for Plaintiff–Appellee.

David S. Kaplan, Colorado State Public Defender, Lisa Dixon, Deputy State Public Defender, Denver, CO, for Defendant–Appellant.

Opinion by Judge MARQUEZ.

Defendant, Thomas Mack, appeals a judgment of conviction entered on a jury verdict finding him guilty of one count of possession of a schedule two controlled substance. We affirm.

Two officers were driving a patrol car near the intersection of Colfax and Ogden in Denver. One of the officers had made numerous narcotics arrests in that area and described it as one of the highest narcotics-dealing areas in the city. The officers observed defendant and another individual standing near the corner of a convenience store. A third individual with some money in his hand walked up to defendant and the other person, and the three then engaged in some conversation. Because the officers believed that the three were going to make a narcotics transaction, the officers pulled into the parking lot, stepped out of their car, and walked towards the three individuals.

As the officers approached, defendant put his hand behind his back. Because he was concerned that defendant might have a weapon, one of the officers then drew his weapon and told defendant to let the officer see his hands. Defendant did not respond, and the officer gave defendant some more commands. When defendant showed his hands, the officer went behind defendant and had him place his hands on top of his head. The officer then ran his hand down defendant's front pants pocket and felt a bulk that felt like plastic. Although the evidence was disputed, according to the officer, the officer asked if defendant had any ID, and defendant stated that he did. Then the officer asked if he could search defendant's pockets and if he could retrieve his ID. Defendant stated, "Go ahead." The ensuing search revealed a bag of crack cocaine, money, and a pager. However, no weapons were found on defendant. Although defendant filed a motion to suppress certain evidence, the court denied his motion.

I.

Defendant contends that the evidence in his case should have been suppressed as the fruit of an illegal search and seizure. Specifically, defendant contends that the state improperly searched and seized him without a warrant. We disagree.

Warrantless searches and seizures are *per se* unreasonable unless they satisfy one of the specifically established and clearly articulated exceptions to the warrant requirement. *See People v. Rodriguez*, 945 P.2d 1351 (Colo.1997).

In the present case, the trial court found there was no illegal search. It found that the officers had a reasonable suspicion that a drug transaction was about to take place, that it was reasonable for the officers to be concerned about their safety when defendant reached behind his back, that they were entitled to search for a gun, and that the search was consensual. We address the validity of these findings and perceive no error.

A.

Defendant contends that the investigatory stop was not supported by reasonable suspicion. We disagree.

Colorado law recognizes three types of police-citizen encounters: 1) arrests; 2) investigatory stops, and 3) consensual en-

counters. *Outlaw v. People*, 17 P.3d 150 (Colo.2001). The first two, an arrest and an investigatory stop, are seizures and implicate the protections of the United States and Colorado Constitutions. Therefore, they must be justified by probable cause and reasonable suspicion of criminal activity, respectively. The third, a consensual interview, is not a seizure and thus does not implicate constitutional protections. *People v. Cervantes–Arredondo*, 17 P.3d 141 (Colo.2001).

Before making an investigatory stop, an officer must have an articulable and specific basis in fact for suspecting that an individual is committing, has committed, or is about to commit a crime. For an investigatory stop to be constitutionally valid, three conditions must exist:

(1) there is reasonable suspicion that the individual has committed, or is about to commit, a crime;

(2) the purpose of the detention is reasonable; and

(3) the character of the detention is reasonable when considered in light of the purpose.

*Outlaw v. People, supra*, 17 P.3d at 156; *People v. Padgett*, 932 P.2d 810 (Colo.1997).

In determining whether an investigatory stop is valid, a court must take into account the facts and circumstances known to the officer at the time of the intrusion. *People v. Padgett, supra*.

Here, the facts and circumstances known to the officers as they approached the defendant were: (1) the area was known for narcotics activity; (2) two men were standing near the front of a convenience store, in daylight; (3) a third man with money in his hand walked toward the two men; and (4) the men started engaging in a conversation.

We conclude that these facts alone were not sufficient to create reasonable suspicion. *See Outlaw v. People, supra; People v. Padgett, supra*. However, an officer's act of merely approaching one suspected of criminal activity does not constitute a stop. Nor does it require reasonable suspicion. *See People v. Melton*, 910 P.2d 672 (Colo.1996).

Here, the officers approached defendant on foot. When they were five to seven feet from him, he put his hand behind his back, and one of the officers drew a weapon and ordered defendant to show his hand. It is at this moment that the officers actually stopped the defendant. *See People v. Archuleta*, 980 P.2d 509 (Colo.1999). According to the officer, defendant hesitated before showing his hand. Because the area was known for criminal activity, and one of the officers had previously taken weapons from others in the same area, it was reasonable for the officers, for their own safety and that of the public, to be concerned about whether defendant was reaching for a weapon. Based upon both these reasons and the totality of facts and circumstances, we conclude that the stop was justified. *See People v. Archuleta, supra*.

While we recognize that defendant's acts after the investigatory stop was initiated cannot be utilized as a rationalization to justify the stop, *see People v. Padgett, supra*, we conclude that that premise does not apply here because defendant reached behind his back before the stop was initiated.

Contrary to defendant's assertions, we also conclude that the purpose of the stop was reasonable and that the scope and character of the intrusion were reasonable.

Further, this case is distinguishable from *Outlaw v. People, supra*, in which the supreme court recently held that a "furtive gesture," standing alone, is too ambiguous to constitute the basis for an investigatory stop. In *Outlaw*, the defendant and his companions began walking away from the officers. As the officers followed in a police cruiser, which was being driven on the sidewalk behind the defendant, one of the officers noticed that the defendant's hand was closed. Here, unlike in *Outlaw*, when the officer approached, defendant placed his hand behind his back and then hesitated when the officer told him to show his hand. Thus, defendant's gesture supported a determination of reasonable suspicion.

Nor does *United States v. Davis*, 94 F.3d 1465 (10th Cir.1996), one of the cases relied upon by the supreme court in *Outlaw*, warrant a different result. In *Davis*, the defen-

dant broke eye contact with the officers and began walking away from the officers with his hands in his pockets. Here, defendant was not walking away. Rather, defendant placed his hand behind his back when the officers were five to seven feet away. *Davis* is thus unlike the present case.

### B.

Defendant specifically contends that the protective frisk was illegal because the officers did not have reasonable suspicion that he was armed and dangerous. We are not persuaded.

██ Once a valid stop has taken place, a protective search for weapons is permitted only if the officer has a reasonable basis to suspect that the person might be armed and dangerous. *People v. Litchfield,* 902 P.2d 921 (Colo.App.1995), *aff'd,* 918 P.2d 1099 (Colo.1996). An officer may then conduct a limited search of the person's clothing; generally, this amounts to a frisk or pat-down of the exterior of the clothing. *People v. Casias,* 193 Colo. 66, 563 P.2d 926 (1977).

██ Here, in view of defendant's action of putting his hand behind his back, the officers' awareness that the area was known for criminal activity, and the officers' previous experience of taking weapons from others in the same area, it was reasonable for the officers, for their own safety, to be concerned about whether defendant was reaching for a weapon. *See People v. Archuleta, supra.*

Because the officers had a reasonable basis to suspect that defendant might be armed and dangerous, we perceive no error in the officer's act of frisking defendant. *See People v. Litchfield, supra.*

### C.

██ We also reject defendant's contention that, even if the officers had a reasonable suspicion that he was reaching for a gun in his rear waistband, the officers exceeded the scope of the frisk when one of them patted down the front pockets of his shorts.

Because the officer limited his frisk to a pat-down of the *exterior* of defendant's cloth-

ing, we do not conclude that he exceeded the scope of the frisk. *See People v. Casias, supra.* A weapon could have conceivably been hidden in one of defendant's front pockets. Significantly, the officer did not reach inside defendant's pocket when he first felt the baggy-like object inside.

### D.

Finally, defendant contends that his consent did not justify the search of his pockets, because the search exceeded the scope of the consent, and the consent was coerced, invalid, and tainted. We disagree.

██ Consent to a search, when freely and voluntarily given, is an exception to the warrant requirement. However, a search made pursuant to consent must be limited to the scope of the consent actually given. *People v. Najjar,* 984 P.2d 592 (Colo.1999).

██ A request by an officer to search for certain items does not mean that the officer must ignore everything else encountered during the resulting intrusion. Instead, the designation of the items being sought serves only to limit the areas where the officer may reasonably look without offending the Fourth Amendment. Within those areas likely to contain the items that were specified, an officer may observe other incriminating objects. *People v. Najjar, supra.*

██ Here, the record supports the trial court's findings that the officer asked whether he could retrieve defendant's identification and search his pockets, and that defendant said "Go ahead." Thus, the officer's act of reaching into defendant's pocket to search for identification and finding a bag of crack cocaine did not exceed the scope of defendant's consent. *See People v. Najjar, supra* (opening of hip bag and observation of luggage claim tag did not exceed scope of defendant's consent to search bag for weapons or illegal substances). *See also Bynum v. Commonwealth,* 23 Va.App. 412, 477 S.E.2d 750 (1996)(search upheld where defendant consented to search of his person for narcotics, and officer searched his pockets and instead found an incriminating key); *State v. Mueller,* 63 Wash.App. 720, 821 P.2d 1267

(1992)(search of pockets of jacket found in defendant's vehicle did not exceed the scope of his consent to search vehicle, where items sought could have fit in the pockets).

Defendant also contends the police coerced his consent. The record, however, supports the trial court's determination that the search was consensual.

▪ The fact of custody alone has never been enough in itself to demonstrate a coerced consent to search. *People v. Helm,* 633 P.2d 1071 (Colo.1981). Nor did the officers' acts of drawing a weapon or commanding defendant to let them see his hands constitute coercion. Under the circumstances, such commands were reasonable. *See People v. Archuleta, supra* (courts uphold officers' conduct of drawing weapons when the circumstances indicate it is a reasonable precaution for the protection and safety of the officers); 3 W. LaFave, *Search and Seizure* § 8.2(b) at 644 (3d ed.1996)(while display of weapons is one coercive factor, it is unlikely that a single coercive element will, standing alone, be enough to invalidate consent).

Finally, defendant claims his consent was tainted by the officers' prior illegal activity. We disagree.

▪ When illegal police action precedes a defendant's consent to search, the illegality may fatally taint the consent. *People v. Rodriguez, supra.*

Because we have determined that the police action that preceded defendant's consent was proper, we conclude that the consent was not fatally tainted.

Consequently, the trial court correctly denied defendant's motion to suppress the evidence taken from him.

## II.

Defendant next contends that the trial court erred by disqualifying a juror who said that he could be objective and follow the judge's instructions despite his personal belief that prison was an unduly harsh penalty for simple possession. We are not persuaded.

## A.

Courts must sustain challenges for cause where "[t]he existence of a state of mind in the juror evince[es] enmity or bias toward the defendant or the state." Section 16–10–103(1)(j), C.R.S.2000; *People v. Young,* 16 P.3d 821 (Colo.2001).

▪ A trial court must grant a challenge for cause if a prospective juror is unable or unwilling to accept the basic principles of criminal law and to render a fair and impartial verdict based on the evidence admitted at trial and the court's instructions. *People v. Lefebre,* 5 P.3d 295 (Colo.2000). The standard for appellate review of a trial court's ruling on a challenge for cause is whether the trial court abused its discretion. Appellate review of a challenge for cause requires consideration of the entire voir dire examination of a juror. *People v. Young, supra.*

▪ An indication by a juror that he has a biased state of mind may cause the trial judge to excuse that juror. However, a prospective juror who makes a statement suggesting actual bias may nonetheless sit on the jury if she or he agrees to set aside any preconceived notions and make a decision based on the evidence and the court's instructions. *People v. Lefebre, supra.*

▪ The case before us involves claims of actual bias because the challenged juror revealed a state of mind that could have prevented him from deciding the case impartially. During voir dire, the prosecutor asked the prospective jurors whether, because of their views on drugs, it would be difficult for them to be jurors in this case involving possession of narcotics. The challenged juror responded affirmatively, indicating that he thought it was "appalling in our country that we have so many people incarcerated simply for victimless crimes, simply for possession of some drug. It's incredible."

The prosecutor next asked this juror whether his views on drugs would affect his ability to be a juror in the case. The juror's response was that he thought he would "be very harsh on how you proved your case." When subsequently asked if he thought he

could be fair, the juror responded, "I don't think the law is fair." He also stated that he had seen drug prosecutions "destroy people's lives." However, in response to a question by defense counsel whether "you are telling me, you could be an objective juror," the juror responded, "Yes."

In granting the challenge for cause, the trial judge reasoned: "He said he's against drug laws. He doesn't think the law is fair. I have a question as to whether he would follow the instructions of law based on his words. I am going to excuse him."

Based upon this record, the trial court did not abuse its discretion in dismissing the challenged juror.

Because the challenged juror's bias was the basis of his dismissal, we also reject defendant's contention that the possibility of jury nullification was not a valid basis to excuse the challenged juror. There is no indication in the trial court's ruling that jury nullification was a concern.

### B.

We also disagree with defendant's contention that the trial court's action in removing the juror for cause prejudiced him by in effect granting the prosecution an additional peremptory challenge.

The function of peremptory challenges in a criminal proceeding is to allow both the prosecution and the defense to secure a more fair and impartial jury by enabling them to remove jurors whom they perceive as biased, even if the jurors are not subject to a challenge for cause. A defendant must be afforded the same number of peremptory challenges and the same capacity to shape the composition of the jury as that possessed by the prosecution. *People v. Lefebre, supra.*

When the prosecution has exhausted its peremptory challenges, an *erroneous* dismissal of a prospective juror gives the prosecution an improper additional peremptory challenge. *See People v. Bernabei,* 979 P.2d 26 (Colo.App.1998). Affording the prosecution an additional peremptory challenge is inherently prejudicial to the defendant. *People v. Lefebre, supra.*

However, in light of our conclusion that the court's decision was neither unwarranted nor erroneous, the trial court did not, in effect, grant the People an additional peremptory challenge, and thus defendant cannot claim prejudice on that ground.

### III.

Nor are we persuaded by defendant's contention that because certain items suggested that he was a drug dealer, yet he was not charged with distribution, the trial court should have excluded from evidence a pager and money found in defendant's pocket.

Evidence that forms part of the criminal transaction with which a defendant is charged is admissible to provide the factfinder with a full understanding of the events surrounding the crime. Such res gestae evidence includes that which provides a background for the offense. *People v. Young,* 987 P.2d 889 (Colo.App.1999).

Res gestae evidence need not meet the procedural requirements of evidence introduced pursuant to CRE 404(b). For res gestae evidence to be admissible, it must be relevant, and its probative value must not be substantially outweighed by the danger of unfair prejudice. *People v. Rollins,* 892 P.2d 866 (Colo.1995). A trial court's determination on the admissibility of res gestae evidence will not be reversed unless the trial court abused its discretion. *People v. Young, supra.*

"Unfair prejudice" refers to an undue tendency on the part of admissible evidence to suggest to the jury an improper basis for its decision. Such evidence must be reviewed in the context of the entire record in order to determine whether it adversely affected the defendant's position. *See People v. Nuanez,* 973 P.2d 1260 (Colo.1999).

Here, the trial court concluded that evidence concerning the money and pager found in defendant's pocket was admissible because the jury was entitled to know the entire scenario, and it was "almost res gestae" evidence. The court further stated that

there was no sufficient ground to suppress either the pager or the money.

In an effort to minimize potential prejudice to defendant, the court ruled before trial that prosecution witnesses could not testify that the items were tools of drug dealers or that the money was suspected narcotics proceeds, and the challenged evidence was mentioned only twice during trial. The evidence was interwoven with the facts of defendant's arrest, was relevant to the jury's full understanding of the events surrounding defendant's search and arrest, and reduced the likelihood that the officers had planted the cocaine on defendant.

Further, the evidence against defendant was overwhelming. Both officers testified without objection that one of them found a baggy containing crack cocaine in defendant's pocket. Therefore, there is little risk that defendant's possession of money and a pager could have formed an improper basis for the jury's decision.

We therefore conclude that admission of the cash and pager was not unfairly prejudicial to defendant and perceive no abuse of discretion in the trial court's ruling.

Accordingly, the judgment is affirmed.

NEY, J., concurs.

RULAND, J., dissents.

Judge RULAND dissenting.

Because I conclude that there was no constitutional basis for the officer to make an investigatory stop in this case, I respectfully dissent from Part I of the majority opinion.

As noted by the majority, the area surrounding the convenience store was known for narcotics activity, defendant and another man were standing near the front of the store in broad daylight, a third man with money in his hand was walking towards the two men, and the three men engaged in conversation. However, the money was not transferred from one person to another, no other item was exchanged by the parties, and no part of the conversation was overheard by the officers. Indeed, as the prosecution properly concedes, there was no basis for an investigative stop at this time.

After the officers arrived in the parking lot and as they walked towards defendant, he simply put his hand behind his back. The officer's response was to draw his weapon. The officer's testimony was as follows:

Q. When you took this gun out and put it in what you call the low ready position, what did the defendant do?

A. Nothing. He just remained in that position.

Q. With his hand behind his back?

A. Yes, sir.

Q. And did you ask him to do anything?

A. I gave him commands about three or four times to let me see his hands.

Q. And what did he do?

A. Well, initially—I mean, the first few commands, he didn't do anything. He just remained in that position. And finally he was showing me his hands like, What?

Q. What did you do at that point?

A. I went behind the defendant, had him put his hands on top of his head, reholstered my weapon, and conducted a pat-down search.

Q. And why are you pat—doing a pat-down search at this point even though he had showed you his hands?

A. Well, I mean, he had loose-fitting clothing that was covering his waistband area. And due to his actions, I felt that he might have a weapon on him, a gun.

The most recent decision of our supreme court to address the issue of investigatory stops is *Outlaw v. People*, 17 P.3d 150 (Colo. 2001). The facts in that case and this are significantly different. However, in reversing a decision by a division of this court approving an investigatory stop, our supreme court noted again that a history of past criminal activity in an area is insufficient, without more, to create a reasonable suspicion that a crime has been or will be committed. Similarly, a gathering of individuals in a public area, standing alone, is insufficient to justify an investigatory stop. Indeed, the court noted that "[p]eaceable gatherings are a hallmark of our democracy, explicitly protected

in both the United States and Colorado Bill of Rights." *Outlaw v. People, supra,* 17 P.3d at 157. Finally, the court noted again that a "furtive gesture," standing alone, is insufficient to warrant an investigatory stop. *See People v. Thomas,* 660 P.2d 1272 (Colo.1983), *overruled in part by People v. Archuleta,* 980 P.2d 509 (Colo.1999); *see also People v. Greer,* 860 P.2d 528 (Colo.1993).

In discussing the various factors that may or may not warrant an investigatory stop, the *Outlaw* court cited the recent opinion in *United States v. Davis,* 94 F.3d 1465 (10th Cir.1996), on several occasions. I view that case as particularly instructive and as requiring reversal of the trial court's ruling here.

In *Davis,* three officers were patrolling an area in a city where various complaints had been received regarding gun shots in the vicinity of a building was known as a "juice joint," *i.e.,* a business that sells liquor without a license. One of the officers testified that in the past he had investigated two shootings in this area and had been involved in eight arrests relating to drug sales or gun use. The officer also stated that gangs such as the "Crips" and the "Bloods" occupied the area and sold drugs there.

The three officers arrived in a marked patrol car and observed a vehicle with four occupants parked near the juice joint. The accused was one of the occupants. He exited the vehicle upon observing the officers, and, as he did so, he made eye contact with one of the officers. The accused then began walking towards the juice joint with his hands in his pockets. The officer knew that the accused was an ex-convict who had been acquitted of a gang-related homicide. The officer had also received information that the accused had sold narcotics in the past.

The officer instructed the accused to stop and take his hands out of his pockets, but the accused ignored the command and continued walking. The officer testified that he was concerned at that point with officer safety and believed that the accused might be hiding a firearm.

Two of the officers grabbed the accused by the arms and told him to place his hands on top of the vehicle. Instead, the accused stepped inside the vehicle and threw a firearm into the backseat.

In response to the accused's motion to suppress, the government relied upon four factors as grounds for an investigative stop: (1) the accused's car was parked outside a known criminal establishment; (2) the accused exited the vehicle when he saw the officers, made and broke eye contact, and then refused to stop; (3) the accused ignored the officer's request to take his hands out of his pockets; and (4) the officers knew that the accused had a prior criminal record. However, the *Davis* court held that none of these factors, standing alone, provided a lawful basis for an investigative detention. More important, the court also held that, taken together, those factors were insufficient.

With reference to the fact that the accused placed his hands in his coat pocket and refused to remove them, the court noted that it was a December night. The court emphasized that no evidence was presented that the officers possessed any particularized basis for suspecting that the accused was armed. Rather, the officer testified that his suspicion of the accused was based simply on his "perception" after ten years on the police force.

In rejecting this perception as a basis for an investigative stop, the *Davis* court noted that there was no evidence of a suspicious bulge in the accused's pockets, there was nothing to indicate that the accused appeared to be hiding anything, and there was no informer who had previously indicated that the accused was either armed or carrying drugs.

Here, like *Davis,* the officers had no particularized knowledge that defendant was carrying a weapon. Further, there was no suspicious bulge in his pants or pockets, and there was no informer who suggested that defendant was armed or selling narcotics. Indeed, unlike *Davis,* the officers had no knowledge whatsoever at the time of any prior criminal activity by this defendant. And, there are many reasons one may postulate for reaching behind one's back as, for example, to retrieve a wallet from a back pocket, to scratch the back, or to pull up one's pants.

Here, however, and unlike *Davis,* defendant actually showed his hands in response to a repeated command. Further, a patdown of his waistband failed to reveal any weapons whatsoever. Finally, I can draw no meaningful distinction in terms of generating a reasonable suspicion on the part of an officer between a person with his hands in a coat pocket where a weapon could be concealed and a person with his hand in a waistband.

Accordingly, under all of these circumstances, in my view the investigatory stop and the subsequent search were constitutionally impermissible because they were not based upon a specific factual basis for suspecting that a crime had been or was being committed. *See Outlaw v. People, supra.* To conclude otherwise means, in my view, that the unfortunate citizen who stops for a cup of coffee at a convenience store in a high-crime area, speaks to other customers, and then places his hand behind his back when an officer approaches is legitimately subjected to detention, possible handcuffing, and pat-down searches.

I would reverse the judgment of conviction and remand the case with directions to grant defendant's motion to suppress.