**UNITED STATES of America,**
**Appellant,**

v.

**Diann Pansey SULLIVAN, a/k/a Brenda Rowe, Kathy Ruth Dendy, a/k/a K. Fletcher, Willie Lee Yelverton, Appellees.**

No. 79–5309.

United States Court of Appeals,
Fourth Circuit.

Argued March 5, 1980.
Decided July 8, 1980.

John F. Hyland, Jr., Asst. U. S. Atty., Baltimore, Md. (Russell T. Baker, Jr., U. S. Atty., Baltimore, Md., and Elizabeth M. Edson, Dept. of Justice, Washington, D C., on brief), for appellant.

S. Ronald Ellison, Baltimore, Md., for appellee Willie Lee Yelverton.

Garry Bonnett, Silver Spring, Md. (Rueben Bonnett, Silver Spring, Md., on brief), for appellee Diann Pansey Sullivan.

Jack D. Leonard, II, Baltimore, Md., on brief, for appellee Kathy Ruth Dendy.

1. The DEA is the Drug Enforcement Administration in the Department of Justice, supplanting the Bureau of Narcotics and Dangerous Drugs. 21 U.S.C. § 802(4) (1979).

2. U.S.Const. Amend. IV:
 The right of the people to be secure in their persons, houses, papers, and effects, against

Before BRYAN, Senior Circuit Judge, WIDENER and HALL, Circuit Judges.

ALBERT V. BRYAN, Senior Circuit Judge:

This case is an outgrowth of the activity of the Drug Enforcement Administration (DEA)[1] designed to develop a comprehensive airport enforcement program concentrated on passengers distrusted as domestic drug couriers.

In its oversight of the Baltimore, Maryland airport, the DEA uncovered in the search and seizure of the suitcases of appellees, Diann Pansey Sullivan, Kathy Ruth Dendy and Willie Lee Yelverton (defendants), evidence that led to their arrest on January 10, 1979, and their indictment on January 17, in the Federal District Court for Maryland. The accusations were illegal possession of a controlled substance, phencyclidine (PCP), with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (1978), interstate travel in aid of racketeering, in disregard of 18 U.S.C. § 1952(a)(3) (1970), as well as aiding and abetting in both offenses, *id.* § 2 (1948).

Except for the preliminary question of the appeal's timeliness, the sole issue is the rightness of the District Court's granting, at a pretrial hearing on September 4, 1979, of the defendants' motion to suppress the evidence taken by the DEA Agents under search warrants procured by them. The ruling was grounded on the Judge's conclusion that the moving affidavits did not establish the "probable cause" demanded therefor by the Fourth Amendment.[2] The infirmity decried by the District Judge as critical was the use of a dog to detect the presence of narcotics in the luggage of two suspected drug smugglers when, in his opinion, the circumstances were not objectively, sufficiently suspect. With the suppression

unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

order effective, the Government acknowledged its inability to go to trial. On October 3, 1979, the prosecution moved for reconsideration and vacation of the September 4 suppression order and the motion was denied October 3. The United States on October 29 filed a notice of appeal from this last order. Defendants now ask for dismissal of the appeal as untimely.

## I.

Deferring momentarily a narration of the evidence anent the search and seizure, we count the appeal as punctually perfected. To begin with, 18 U.S.C. § 3731 (1971) declares:

\* \* \* \* \* \*

[A]n appeal by the United States shall lie to a court of appeals from a decision or order of a district courts (*sic*) suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.

The appeal in all such cases shall be taken within thirty days after the decision, judgment or order has been rendered and shall be diligently prosecuted.

\* \* \* \* \* \*

The provisions of this section shall be liberally construed to effectuate its purposes.

Appellees argue that the 30-day period of limitations began to run September 4, 1979, the day the District Court allowed defendants' motion to suppress. As explained, the Government on October 3 unsuccessfully sought reconsideration and vacation of the suppression order. Upon that occasion—the twenty-ninth day after denial of the motion—the judge commented to counsel that the United States had but one more day in

which to note an appeal from the suppression order. Twenty-six days later, October 29, the Government appealed from the "Suppression Order entered in this proceeding on October 3, 1979, [the date of the denial of the motion to reconsider and vacate the order of suppression]."

 Despite the argument that the appeal period had expired 30 days from the entry of the September 4 suppression order, it must be recalled "that the consistent practice in civil and criminal cases alike has been to treat timely petitions for rehearing as rendering the original judgment nonfinal for purposes of appeal for as long as the petition is pending." *United States v. Dieter*, 429 U.S. 6, 8, 97 S.Ct. 18, 19, 50 L.Ed.2d 8 (1976), *citing United States v. Healy*, 376 U.S. 75, 78–79, 84 S.Ct. 553, 555–56, 11 L.Ed.2d 527 (1964) (footnote omitted). Hence, the September 4 order could not be treated as the final order until the Court had disposed of the motion for reconsideration on October 3. It is from this later date that the 30-day period began to run. Hence, there was no tardiness in taking an appeal 26 days later.

## II.

The merit of this appeal hinges upon the answer to the inquiry as to whether the affidavits manifest a "probable cause" for the search and seizure of the defendants' traveling bags, as enjoined by the Fourth Amendment. The District Judge's ultimate answer was that the sworn statements of the DEA Agents did not meet this standard. He found the dog's olfaction was the primary instigation of the search and, as such, the basis of the Government's claim of probable cause. As his conclusion, the Judge reasoned there was no right demonstrated for setting the dog to nose out appellees' luggage, because there were not enough objectively suspicious facts to precipitate such action.

Disagreeing, we think the Agents' precedent information and observations justly

accounted for calling on the dog.[3] The odor of a drug emanated from a source located in an area where privacy cannot be expected. Thus, his sniffing was in no fashion an intrusion upon the privacy of "persons, houses, papers and effects . . . ." For substantiation of this view we look to the recital of the events as detailed in the affidavits.

On January 9, 1979, at about 11:00 p. m., two women (defendants Sullivan and Dendy) stepped from a taxi in front of the American Airlines terminal at the Los Angeles International Airport while the driver took out their four new suitcases, all the same size. This occasion was witnessed by DEA Agent Kaiser, dressed in plain clothes but assigned to duty at the airport. The two then went into the main building, following the sky cap carrying the luggage. In a few minutes they checked their bags at the ticket counter. Sullivan paid cash for two, one-way tickets to Baltimore, in the names of Brenda Rowe and K. Fletcher. As the women stood in line for their tickets, the Agent found them to be very nervous and conscious of others around them. Trained in detecting drug couriers, the Agent found the combination of circumstances suspicious—new luggage, one-way tickets, and payment in cash.

Thereupon, the Agent got in touch with the dog handler at the city police department, giving him a description of the women's luggage. After the four suitcases had been sent down to the airport baggage room, a handler arrived with a dog (Frog). Frog was proficient in the discovery of marijuana, heroin and cocaine and had training for PCP, but was not certified in its detection. He was taken to the baggage area and was pointed by the handler to the four bags. The dog did not show a "full alert"—that is, give signs of sensing drugs by pawing at the luggage excitedly—but he did show an interest in one blue bag of defendant Sullivan.

In the course of their investigation, the Agents then asked the two women for identification under the pretense that they were looking for counterfeiting suspects. Sullivan, traveling as Brenda Rowe, produced her Washington, D.C. driver's license, showing her true identity. The woman possessing the ticket in the name of K. Fletcher said she had no identification. The Agents also ascertained that Sullivan had given a Los Angeles call-back number to American Airlines. After calling that number, the Agents discovered the party answering did not know of a Brenda Rowe.

With the women and bags aboard, the plane departed Los Angeles for Baltimore shortly after midnight on January 10, subject to a stopover at Dallas, Texas. Meanwhile, the Agents had reported these developments to DEA officials in Dallas, and the latter had notified Los Angeles as soon as the two women and their bags went on to Baltimore in the same plane. Upon arrival there, in the early morning of January 10, 1979, the women left the plane. A DEA Agent followed them to the baggage claim space of the airport where they were met by defendant Yelverton and one Jefferson, not an indictee. The two men picked up the women's four travel bags, including the blue one to which the dog had reacted. As the four were leaving with their luggage, the DEA Agent, after making known his official status, directed them to accompany him and to bring along the baggage. The group was taken to the Maryland State Police Offices at the airport, where Sullivan identified a six-ounce Listerine bottle in her shoulder bag as PCP. The four were placed under arrest.

On his affidavit, reiterating in detail the events just recounted, the Agent procured from a Federal Magistrate a search warrant for the suspicious, sniffed bag. The search disclosed two 36-ounce Listerine bottles containing liquid PCP. Another warrant was then obtained from another Magistrate for the search of the remaining three bags. That search revealed six more 36-ounce

---

3. *Cf. United States v. Mendenhall,* —— U.S. ——, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (behavior conforming to "drug courier profile"

was ample to justify suspicion for investigative *Terry* stop which led to discovery of heroin in subsequent consensual search).

Listerine bottles, also containing liquid PCP. The total amount of liquid PCP found was about 258 fluid ounces.[4]

### III.

■ Ample judicial forerunners uphold the Government's enlistment of the olfactory perception of a dog. *United States v. Venema,* 563 F.2d 1003 (10th Cir. 1977); *United States v. Solis,* 536 F.2d 880 (9th Cir. 1976); *United States v. Bronstein,* 521 F.2d 459 (2d Cir.), *cert. denied,* 424 U.S. 918, 96 S.Ct. 1121, 47 L.Ed.2d 324 (1975); *United States v. Fulero,* 498 F.2d 748 (D.C.Cir. 1974). *See also United States v. Burns,* 624 F.2d 95, 101 (10th Cir. 1980); *United States v. Race,* 529 F.2d 12, 14 n. 2 (1st Cir. 1976). At the heart of the inquiry is the permissible level of intrusion tolerable by our society under the Fourth Amendment.

■ It cannot be questioned that an odor can be a clue to criminal activity and if detected by the sensory organs of man would not constitute a search. *United States v. Brown,* 487 F.2d 208 (4th Cir. 1973), *cert. denied,* 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974). Dogs, with their enhanced faculty of smell, can be trained to detect specific substances, and we find the assistance provided by these animals to be reasonable. Law enforcement officers historically have employed canines in the detection of crime. In situations similar to the present one, use of these beasts has been made in response to the need to control the rise in illegal drug trafficking, while preserving, at the same time, an airline passenger's reasonable expectation of privacy.

■ In *United States v. Bronstein,* 521 F.2d at 461–62, the Court explicitly held that it could not be considered a search within the protection of the Fourth Amendment, for a dog to sniff bags handled by an airline. There can be no reasonable expectation of privacy when any passenger's bags may be subjected to close scrutiny for the protection of public safety. We follow the

Second Circuit in reaching our conclusion that having defendants' luggage sniffed by Frog was not a search. The response by Frog during his inspection, moreover, provided sufficient probable cause, particularly when coupled with the other facts laid out in the affidavit, to support the issuance of the search warrant.

Consequently, the judgment on appeal is reversed and the case remanded to the District Court for trial.

Reversed and Remanded.

---

4. Both of the warrant-affidavits stated that defendant Sullivan, before leaving the Baltimore

terminal, had confessed to the possession of the contraband.