The PEOPLE of the State of Colorado,
Plaintiff-Appellee,

v.

Darrell UNRUH, Defendant-Appellant.

No. 84SA299.

Supreme Court of Colorado,
En Banc.

Jan. 21, 1986.
Rehearing Denied Feb. 24, 1986.

Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Richard H. Forman, Sol. Gen., and Eric B. Perryman, Asst. Atty. Gen., Denver, for plaintiff-appellee.

Jeffrey A. Springer, P.C., Jeffrey A. Springer and Robert M. Brown, Denver, for defendant-appellant.

DUBOFSKY, Justice.

Darrell Unruh, the defendant, was convicted in Denver District Court after a jury trial of possession of cocaine under sections 18–18–105, 8 C.R.S. (1985 Supp.), and 12–22–310, 5 C.R.S. (1985), and possession of more than one ounce of marijuana under section 18–18–106, 8 C.R.S. (1985 Supp.). The defendant challenges his conviction on the grounds that section 18–18–105 denies him equal protection of the laws [1] and that his conviction was based on evidence that the district court should have suppressed because it was obtained in violation of the fourth amendment to the United States Constitution and article II, section 7, of the Colorado Constitution. The evidence that the defendant challenges is the cocaine and

marijuana discovered in his safe after a trained police dog sniffed and reacted positively to the safe. We affirm the judgment of the district court.

On September 29, 1981, Detective Robert Turner of the Denver Police Department observed three individuals attempting to cover a large, apparently heavy object in the trunk of a car. Detective Turner drove past the car and then returned for another look. He found the car abandoned with a safe visible in the trunk. Detective Turner radioed a description of the individuals he had seen trying to conceal the safe and shortly thereafter police officers apprehended a suspect. The suspect told Turner that he had participated with two others in the burglary of a residence in the vicinity of Second Avenue and Colorado Boulevard. According to Detective Turner, the suspect also told him that he thought the safe contained money and drugs.

Another detective located a house that appeared to have been broken into in the neighborhood described by the suspect to Detective Turner. The front door of the house was open and the door jamb was splintered. Detective Turner arrived, shouted "police" into the residence, and then entered. Inside the house Detective Turner noticed on a table a checkbook and several pieces of mail bearing the names of the defendant and his wife. Turner contacted the bank indicated on the checkbook in an attempt to locate the defendant. He then conducted a search of the premises. On the lower floor of the house Turner noticed marks in a small room or closet indicating where the safe had been located. In the same closet, he observed a triple-beam scale, a mirror, two teaspoons, and a playing card, all bearing a white residue.

Shortly after the discovery of these items, the defendant returned home. He confirmed the fact that his safe had been stolen, and Detective Turner informed him that the safe had been recovered and taken to police headquarters for safekeeping.

---

**1.** Because the defendant challenges the constitutionality of a state statute, jurisdiction to consid-

er this appeal is in this court under section 13–4–102(1)(b), 6 C.R.S. (1973 and 1985 Supp.).

The defendant asked Detective Turner when he might expect the release of the safe and was told "probably the following day or so."

Detective Turner suspected that the safe contained drugs because of the burglary suspect's statements, the scale, spoons, playing card, and mirror found in the room where the safe had been located, and the fact that the defendant's name sounded familiar. Turner contacted a detective in the Denver Police Department vice bureau who produced from his files a card on a Darrell Norman Unruh. The card listed Unruh's address as 2050 South Columbine and indicated, in an entry dated September 24, 1979, that Darrell Norman Unruh was a suspected cocaine dealer.

The detectives decided to submit the safe to a sniff by a narcotics detection dog. According to Detective Turner, when the dog was brought into the room at the police department where the safe was being kept, the dog "immediately responded to the safe and pawed at it. The dog was then taken from the room and brought back and he immediately went to the same safe again." In an affidavit seeking a warrant to open the safe, Detective Turner recited the bases of his suspicions concerning the contents of the safe and the results of the dog sniff. After obtaining the warrant, the police officers had the safe pried open with hydraulic tools. Inside, they discovered, among other things, 126 grams of cocaine and 1.2 kilograms of marijuana. The defendant moved to suppress the contents of the safe. The district court denied the motion, and the defendant was convicted of possession of cocaine and marijuana.

## I.

The defendant contends that his conviction of a felony under section 18–18–105 violated his right to equal protection of the laws [2] because section 12–22–314(1)(m), 5 C.R.S. (1985 Supp.), punishes possession of cocaine obtained from an unlawful source by a "practitioner" as a misdemeanor. The term "practitioner" is defined by section 12–22–102(16), 5 C.R.S. (1985) as "a person authorized by law to prescribe any drug, medicine, or poison, acting within the scope of such authorization."

In resolving doubts concerning the constitutionality of a statute, we are guided by a number of well-established principles. A statute is presumed to be constitutional, and the burden of proving the contrary is on the person attacking the statute. *People v. Velasquez,* 666 P.2d 567, 569 (Colo.1983); *People v. Alexander,* 663 P.2d 1024, 1027 (Colo.1983). Where, as in this case, the challenged statute does not involve a suspect classification or touch upon a fundamental right, the court will uphold a statutory classification if it is reasonably related to a legitimate governmental interest. *People v. Velasquez; Dawson v. Public Employees Ass'n,* 664 P.2d 702, 707 (Colo.1983). Because "[e]qual protection of the law is a guarantee of like treatment of all those who are similarly situated," this court has held that conviction under a statutory scheme "which prescribes different degrees of punishment for the same acts committed under like circumstances by persons in like circumstances is violative of a person's right to equal protection of the laws." *People v. Calvaresi,* 188 Colo. 277, 282, 534 P.2d 316, 318 (1975).

The differences between practitioners and non-practitioners justify imposing on practitioners a lesser degree of punishment for unlawful possession of cocaine. The General Assembly reasonably could have concluded that a lesser punishment for practitioners was appropriate because practitioners are engaged in an occupation that regularly requires the administration, dispensation, and possession of controlled

---

**2.** The fourteenth amendment to the United States Constitution provides in part, "No state shall ... deny to any person within its jurisdiction the equal protection of the laws." A similar guarantee of equal protection is implicit in the due process provision of the state constitution. *Colo. Const.,* art. II, § 25. *People v. Marcy,* 628 P.2d 69 (Colo.1981); *People v. Taggart,* 621 P.2d 1375 (Colo.1981); *Heninger v. Charnes,* 200 Colo. 194, 613 P.2d 884 (Colo.1980).

substances. The statutory classification drawn by sections 18–18–105 and 12–22–314 is reasonably related to a legitimate governmental interest, and the defendant's conviction under section 18–18–105 did not deny him equal protection.[3]

## II.

Both the federal and state constitutions provide protection from unreasonable searches and seizures.[4] The defendant asserts that his conviction cannot stand because it rested on the admission of evidence obtained in violation of these constitutional provisions. He argues first that the retention of his safe by the police officers after it had been recovered from the burglars' automobile constituted an illegal seizure of the safe. We disagree.

One of the definitions of a "seizure" within the meaning of the prohibition against unreasonable searches and seizures in the federal constitution is "a forcible or secretive dispossession of something against the will of the possessor or owner." *United States v. Haden*, 397 F.2d 460, 465 (5th Cir.1968), *cert. denied*, 396 U.S. 1027, 90 S.Ct. 574, 24 L.Ed.2d 523 (1970); *see also United States v. Thomas*, 613 F.2d 787, 793 (10th Cir.1980), *cert. denied*, 449 U.S. 888, 101 S.Ct. 245, 66 L.Ed.2d 114; *United States v. White*, 268 F.Supp. 998, 1003 (D.D.C.1966). In light of this definition, it would be difficult to characterize the detention of the defendant's safe by the police from the time they recovered it from the burglars' automobile until the next day when the safe was opened as a "seizure." As the People observe, there is no indication in the record that the defendant ever directly requested the return of the safe after the police took custody of it in a lawful manner. The defendant asked Detective Turner when he could recover the safe, and he apparently did not demur when Turner replied that the defendant might arrange for its release "probably the following day or so." The detention of the safe was not the result of the defendant's having been forcibly or secretly dispossessed of the safe against his will.

■ However, even assuming that the detention of the safe may be characterized as a "seizure," we are not prepared to say that the seizure was illegal. Where police officers lawfully come into possession of property it is not unreasonable *per se* for them to detain the property for possible use as evidence. *United States v. Hubbard*, 650 F.2d 293 (D.C.Cir.1980); *United States v. Farrell*, 606 F.2d 1341 (D.C.Cir. 1979). Of course, even where the initial seizure of property by police officers was valid, the circumstances of the subsequent detention may render the detention unreasonable. *See United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 1662, 80

---

**3.** The People suggest that because the definition of a practitioner is limited to a person "acting within his authority to prescribe drugs," the mere possession of cocaine by a practitioner who does not prescribe the drug would in fact be punishable as a felony under section 18–18–105. The defendant argues that this construction would render section 12–22–314(1)(m) meaningless. We need not resolve this conflict here because we conclude that even if the defendant is correct in his assertion that a practitioner may be punished only as a misdemeanant for simple possession of cocaine, the distinction between the degrees of punishment mandated by sections 12–22–314(1)(m) and 18–18–105 retains a rational basis. A practitioner convicted under section 12–22–314(1)(m) for simple possession of cocaine obtained from an unlawful source would be subject, depending on the circumstances, to other sanctions, including loss of license to issue prescriptions.

In his supplemental list of authorities filed with this Court two weeks before oral argument, the defendant raised a new equal protection argument. He asserted that his conviction under section 18–18–105 as a class 3 felon for possession of cocaine is violative of equal protection because section 18–18–104, 8 C.R.S. (1985 Supp.), punishes the *use* of cocaine as a class 5 felony. The defendant raised this issue too belatedly for us to consider it. *Massey v. People*, 656 P.2d 658 (Colo.1982).

**4.** The fourth amendment to the United States Constitution declares in part: "The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated." Article II, § 7, of the Colorado Constitution provides in part: "The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures."

L.Ed.2d 85 (1984); *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). In *Place,* the United States Supreme Court determined that the reasonableness of a detention of property initially seized in a lawful manner should be assessed by "balanc[ing] the nature and quality of [the] intrusion on the individual's Fourth Amendment [possessory] interests against the importance of governmental interests alleged to justify the intrusion." 462 U.S. at 703, 103 S.Ct. at 2642; *see also Jacobsen,* 104 S.Ct. at 1662–1663.

■ Applying these principles to the facts before us, we conclude that the detention of the defendant's safe, after it was recovered from the burglars' automobile until the safe was opened and the cocaine discovered, was not an unconstitutional seizure of the safe. The police officers came into possession of the safe lawfully. They had a legitimate interest in retaining the safe for possible use as evidence in the prosecution of the individuals who had stolen it from the defendant's home.[5] The interference with the defendant's possessory interest in the safe was relatively minimal: the safe was held in police headquarters only overnight before the search warrant was obtained. This limited intrusion on the defendant's possessory right to the safe does not outweigh the interests of the police officers in retaining the safe for the period of time at issue here.

### III.

The defendant next urges that submitting his safe to a sniff by the narcotics detection dog was a search, not justified by probable cause or a reasonable suspicion to believe that the safe contained contraband, that violated the constitutional prohibitions against unreasonable searches. We are not the first court to consider whether a sniff by a narcotics detection dog is a search. In *United States v. Place,* 462

U.S. 696, 103 S.Ct. 2637, the Supreme Court determined that, under the circumstances there, a dog sniff was not a search. The Court, analyzing the question in the context of an alleged "search" by a dog sniff of the respondent's luggage at an airport, reasoned as follows:

> A "canine sniff" by a well-trained narcotics detection dog ... does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage.
>
> Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.
>
> In these respects, the canine sniff is *sui generis.* We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here—exposure of respondent's luggage, which was located in a public place, to a trained canine—did not constitute a "search" within the meaning of the Fourth Amendment.

462 U.S. at 707, 103 S.Ct. at 2644.

The Court's conclusion with respect to the dog sniff issue in *United States v.*

---

5. Although the defendant contends that the safe was not in fact "retained for any evidentiary purposes in the burglary investigation as no fingerprints were sought to be lifted from the safe," and the record shows that the police believed an attempt to obtain fingerprints from the safe would have been futile because "[i]t had been touched too many times," we cannot say that the safe's only possible value as evidence against the burglars was as a source of fingerprints.

*Place* "represents the culmination of an overwhelming trend among the courts." Comment, *The Constitutionality of the Canine Sniff Search: From Katz to Dogs,* 68 Marquette L.Rev. 57, 81 (1984). Prior to *Place,* the majority of the federal circuit courts of appeals had decided that a dog sniff is not a search *per se;* numerous state courts had rendered similar decisions.[6] Many of these courts, like the Court in *Place,* grounded their decisions on the peculiarly nonintrusive and discriminating nature of an investigatory dog sniff. Some analogized the use of trained dogs to detect narcotics to the use of certain sense-enhancing instruments such as binoculars and flashlights that have not been considered searches.[7] A few of these courts adopted what has been referred to as the "plain smell" doctrine, holding that there can be no reasonable expectation of privacy and, consequently, no constitutionally protectable interest, in the odors emanating from a closed container.[8]

Most commentators who have considered the issue, and a small minority of courts, have characterized a dog sniff as a search.[9] These courts and commentators compare the use of dogs to detect narcotics to the use of electronic "bugs," magnetometers, and similar investigative devices. Perhaps the clearest expression of the minority position is found in the concurring opinion in *United States v. Bronstein,* 521 F.2d 459 (2d Cir.1975), *cert. denied* 424 U.S. 918, 96 S.Ct. 1121, 47 L.Ed.2d 324 (1976). There, Judge Mansfield made the following observations:

> There is no legally significant difference between the use of an X-ray machine or magnetometer to invade a closed area in order to detect the presence of a metal pistol or knife, which we have held to be a search * * *, and the use of a

**6.** *See, e.g., United States v. Lewis,* 708 F.2d 1078 (6th Cir.1983); *United States v. Waltzer,* 682 F.2d 370 (2d Cir.1982), *cert. denied,* 463 U.S. 1210, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983); *United States v. Goldstein,* 635 F.2d 356 (5th Cir.1981), *cert. denied,* 452 U.S. 962, 101 S.Ct. 3111, 69 L.Ed.2d 972 (1981); *United States v. Klein,* 626 F.2d 22 (7th Cir.1980); *United States v. Sullivan,* 625 F.2d 9 (4th Cir.1980), *cert. denied,* 450 U.S. 923, 101 S.Ct. 1374, 67 L.Ed.2d 352 (1981); *United States v. Race,* 529 F.2d 12 (1st Cir.1976); *United States v. Bronstein,* 521 F.2d 459 (2d Cir.1975), *cert. denied,* 424 U.S. 918, 96 S.Ct. 1121, 47 L.Ed.2d 324 (1976); *United States v. Fulero,* 498 F.2d 748 (D.C.Cir.1974); *People v. Mayberry,* 31 Cal.3d 335, 644 P.2d 810, 182 Cal. Rptr. 617 (1982); *State v. Morrow,* 128 Ariz. 309, 625 P.2d 898 (1981); *People v. Price,* 54 N.Y.2d 557, 446 N.Y.S.2d 906, 431 N.E.2d 267 (1981); *State v. Mosier,* 392 So.2d 602 (Fla.App.1981); *State v. Wolohan,* 23 Wash.App. 813, 598 P.2d 421 (1979).

**7.** *See, e.g., United States v. Bronstein,* 521 F.2d 459 (2d Cir.1975), *cert. denied,* 424 U.S. 918, 96 S.Ct. 1121, 47 L.Ed.2d 324 (1976).

**8.** *See, e.g., United States v. Sullivan,* 625 F.2d 9 (4th Cir.1980), *cert. denied,* 450 U.S. 923, 101 S.Ct. 1374, 67 L.Ed.2d 352 (1981); *United States v. Venema,* 563 F.2d 1003 (10th Cir.1977); *United States v. Bronstein,* 521 F.2d 459 (2d Cir. 1975), *cert. denied,* 424 U.S. 918, 96 S.Ct. 1121, 47 L.Ed.2d 324 (1976); *People v. Mayberry,* 31 Cal. 335, 644 P.2d 810, 182 Cal.Rptr. 617 (1982); *State v. Wolohan,* 23 Wash.App. 813, 598 P.2d 421 (1979).

**9.** For commentary representative of this view, see, *e.g.,* Comment, *The Constitutionality of the Canine Sniff Search: From Katz to Dogs,* 68 Marquette L.Rev. 57 (1984); Comment, 13 San Diego L.Rev. 410 (1976); Note, *Constitutional Limitations on the Use of Canines to Detect Evidence,* 44 Fordham L.Rev. 973 (1976).

The few court decisions concluding that a dog sniff is a search include *United States v. Beale,* 674 F.2d 1327 (9th Cir.1982), *vacated and remanded,* 463 U.S. 1202, 103 S.Ct. 3529, 77 L.Ed.2d 1382 (1983), *on rehearing,* 736 F.2d 1289 (1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 565, 83 L.Ed.2d 506; *United States v. Solis,* 393 F.Supp. 325 (C.D.Cal.1975), *rev'd* 536 F.2d 880 (9th Cir.1976); *People v. Evans,* 65 Cal.App.3d 924, 134 Cal.Rptr. 436 (1977); *State v. Elkins,* 47 Ohio App.2d 307, 354 N.E.2d 716 (1976).

In *Pooley v. State,* 705 P.2d 1293 (Alaska App. 1985), a case decided after *Place,* the Alaska Court of Appeals held that a dog sniff is a search under the state constitution.

The courts in *Horton v. Goose Creek Consolidated Indep. School Dist.,* 690 F.2d 470 (5th Cir. 1982), *cert. denied,* 463 U.S. 1207, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983), and *Jones v. Latexo Indep. School Dist.,* 499 F.Supp. 223 (E.D.Tex. 1980), held that use of trained dogs to sniff the persons of school students constituted an unreasonable search. *But see Doe v. Renfrow,* 475 F.Supp. 1012 (N.D.Ind.1979) (submission of junior and senior high school students to dog sniff did not constitute search).

dog to sniff for marijuana inside a private bag. Each is a non-human means of detecting the contents of a closed area without physically entering into it. The magnetometer ascertains whether there is metal in the hidden space by detecting changes in the magnetic fields surrounding the area of the hidden space. The dog uses its extremely sensitive olfactory nerve to determine whether there are marijuana molecules emanating from the hidden space. Neither constitutes a particularly offensive intrusion, such as ransacking the contents of the hidden space, or exposing a person to indignities in the case of a personal search. But the fact remains that each detects hidden objects without actual entry and without the enhancement of human senses. The fact that the canine's search is more particularized and discriminate than that of the magnetometer is not a basis for a legal distinction. The important factor is not the relative accuracy of the sensing device but the fact of the intrusion into a closed area otherwise hidden from human view, which is the hallmark of any search.

521 F.2d at 464.

The defendant urges us to adopt the minority view, pointing out that in the past we have interpreted Article II, section 7, of the state constitution to provide greater protection for the individual from governmental investigative techniques than is provided by United States Supreme Court interpretations of the corresponding provision of the federal constitution. For example, in *People v. Sporleder*, 666 P.2d 135 (1983), we held that the use of electronic pen registers to record numbers dialed from a private telephone was a search under the state constitution even though the United States Supreme Court in *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), had decided that the use of a pen register did not amount to a search under the fourth amendment to the federal constitution. *See also People v. Oates*, 698 P.2d 811 (Colo.1985) (installation of electronic beeper constitutes search under state constitution); *Charnes v. DiGia-*

*como*, 200 Colo. 94, 612 P.2d 1117 (1980) (governmental use of individual's bank records is a search under state constitution).

■ Analysis of protection for the individual against governmental investigative techniques under both the state and federal constitutions begins with *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). *People v. Oates*, 698 P.2d at 814. When a defendant challenges governmental investigative activity involving an intrusion into his privacy, *Katz* requires a two-step inquiry: (1) was the intrusion a search; (2) if so, was it a reasonable search. The first question, whether the intrusion was a search, is answered by determining whether the individual had a reasonable expectation of privacy with respect to the object of the governmental intrusion. The answer to the second question, whether the search was reasonable, depends on whether prior judicial approval was obtained; if not, the search was *"per se* unreasonable" unless the intrusion fits within an established exception to the warrant requirement. *See* Peebles, *"The Uninvited Canine Nose and the Right to Privacy: Some Thoughts on Katz and Dogs,"* 11 Georgia L.Rev. 75, 81–82 (1976).

■ Whether a dog sniff constitutes a search turns first on whether it was an intrusion into something that the individual reasonably expected to be private. The analysis in many of the dog sniff cases has stopped with the determination that a dog sniff, much less intrusive than a typical search, is not an invasion of a reasonable expectation of privacy. *See, e.g., United States v. Place*, 462 U.S. at 707, 103 S.Ct. at 2644; *People v. Mayberry*, 31 Cal.3d 335, 644 P.2d 810, 813, 182 Cal.Rptr. 617 (1982). Conceding that dog sniffs are less intrusive than other types of investigative techniques, we still must consider whether the limited intrusiveness of the sniff is an invasion of a reasonable expectation of privacy. Most of the cases in which courts have concluded that a dog sniff is not a search have involved either luggage or

closed containers in an airport where, for safety reasons, people may expect their luggage or parcels to be subject to some type of governmental inspection. *See, e.g., United States v. Place; United States v. Goldstein,* 635 F.2d 356 (5th Cir.1981), *cert. denied,* 452 U.S. 962, 101 S.Ct. 3111, 69 L.Ed.2d 972; *United States v. Klein,* 626 F.2d 22 (7th Cir.1980); *United States v. Sullivan,* 625 F.2d 9 (4th Cir.1980), *cert. denied* 450 U.S. 923, 101 S.Ct. 1374, 67 L.Ed.2d 352; *United States v. Bronstein; People v. Mayberry; People v. Salih,* 173 Cal.App.3d 1009, 219 Cal.Rptr. 603 (1985); *State v. Snitkin,* 681 P.2d 980 (Hawaii 1984).

Although we need not make the decision in this case, it may well be, as a majority of courts have held, that when a dog is used to sniff luggage or parcels at an airport, the sniff does not constitute a search because the persons whose luggage or parcels are sniffed have no reasonable expectation of privacy from an investigative technique as non-intrusive as a dog sniff. However, the facts of the case before us do not lend themselves to the same mode of resolution because the defendant, or anyone in his situation, could have no expectation that the privacy provided by a locked safe in his basement would be subject to a governmental investigative technique of any sort.[10] Therefore, we determine that, because the defendant had a reasonable expectation of privacy in the safe, the dog sniff was a search.

■ Our holding that the dog sniff of the defendant's safe was a search is only the first step of the analysis. We must also determine, considering all the circumstances of the search, whether the warrantless search was unreasonable. As noted earlier in this opinion, warrantless searches are presumptively unreasonable. *Chimel*

*v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *People v. Turner,* 660 P.2d 1284, 1287 (Colo.1983). Moreover, even in the limited types of situations in which a warrantless search or seizure might be justified, the requirement of probable cause to obtain a warrant has generally been retained. *See, e.g., People v. Bustam,* 641 P.2d 968 (Colo.1982); *People v. Cunningham,* 194 Colo. 198, 570 P.2d 1086 (1977).

■ In this case we must determine whether a warrant is necessary before a dog sniff, and, if not, the proper standard for a warrantless sniff. One of the situations in which a warrantless search based on something less than probable cause may be justified is the type of situation presented in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry,* the United States Supreme Court held that the warrantless stop and frisk for weapons of a criminal suspect on the street is permissible where the police officers have a reasonable suspicion based on "specific and articulable facts" to believe that the suspect is armed. 392 U.S. at 21. The rationale of *Terry,* which this court adopted in interpreting the state constitution, *People v. Tate,* 657 P.2d 955 (Colo.1983); *People v. Casias,* 193 Colo. 66, 563 P.2d 926 (1977); *Stone v. People,* 174 Colo. 504, 485 P.2d 495 (1971), is that the nature of a particular type of search is relevant to the question whether the search was reasonable. The Court in *Terry* stated:

> In order to assess the reasonableness of [a protective patdown search] as a general proposition, it is necessary "first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen," for there is

---

**10.** Here, unlike the cases involving dog sniffs at airports, the defendant did not cause the object of the sniff to be in a place where it would likely be subjected to any type of examination. The fact that the safe legitimately came into the hands of the police, through a series of events quite beyond the defendant's knowledge or control, does not diminish his privacy interest in the contents of the safe. *Cf. United States v.*

*Chadwick,* 433 U.S. 1, 13–14 n. 8, 97 S.Ct. 2476, 2484–2485 n. 8, 53 L.Ed.2d 538 (1977). And while the defendant's failure to demand the immediate return of the safe is relevant to the propriety of detaining the safe at police headquarters for possible use in prosecuting the burglars, the defendant cannot be said to have consented to an examination of the contents of the locked safe.

"no ready test for determining reasonableness other than by balancing the need to search ... against the invasion which the search ... entails."

392 U.S. at 20–21, 88 S.Ct. at 1879 (quoting *Camara v. Municipal Court*, 387 U.S. 523, 534–535, 536–537, 87 S.Ct. 1727, 1733–1734, 1735, 18 L.Ed.2d 930 (1967)).

If the reasonableness of dog sniff searches is analyzed in terms of the methodology set out in *Terry*, it has been suggested that this type of search is justified where the police have a reasonable suspicion to believe that the object to be searched contains drugs. *See United States v. Place*, 462 U.S. at 723, 103 S.Ct. at 2653 (Blackmun, J., concurring in the judgment) ("A dog sniff may be a search, but a minimally intrusive one that could be justified in this situation under *Terry* upon mere reasonable suspicion."); *Pooley v. State*, 705 P.2d 1293, 1311 (Alaska App. 1984). *See also* Peebles, *supra*, at 75 (1976); Note, *Police Use of Sense-Enhancing Devices and the Limits of the Fourth Amendment*, 1977 Ill.L.F. 1167; W. LaFave, *supra*, § 2.2.

We are convinced that the balance between governmental and individual interests in this case can best be struck by requiring only reasonable suspicion as a prerequisite for the sniff search. The government's interest in suppressing the use and distribution of illegal drugs is compelling. On the other side of the balance, as the facts of this case illustrate, a search by a narcotics detection dog generally involves far less an intrusion than any other type of search technique because the sniff is uniquely selective, detecting in most cases only the presence of narcotics. *See, e.g., United States v. Place; see also* W. LaFave, *supra*, § 2.2; Peebles, *supra*, at 89; Note, *Constitutional Limitations on the Use of Canines to Detect Evidence*, 44 Fordham L.Rev. 973, 986–87 (1976).

The defendant contends that even if an exploratory dog sniff may be justified on the grounds of reasonable suspicion, the requisite reasonable suspicion in this case was not met by the facts known to the officers prior to the dog sniff. In other contexts we have held that "specific and articulable facts ... together with the rational inferences from these facts" may give rise to a reasonable suspicion. *People v. Wells*, 676 P.2d 698, 701 (Colo.1984); *People v. Davis*, 669 P.2d 130, 134 (Colo. 1983); *People v. Thomas*, 660 P.2d 1272, 1274 (Colo.1983). Here, Officer Turner testified that his suspicion that the defendant's safe contained drugs was based on the following facts: the statement made to him by one of the burglars about the alleged contents of the safe; the discovery of the white-coated scales, playing card, mirror and spoons; and the card produced from vice bureau files.

The defendant argues that the paraphernalia found in the basement must be excluded as a basis for reasonable suspicion because the scales, mirror, spoons and playing card were observed in the course of an invalid search. Under the emergency exception to the warrant requirement, police officers may enter private property without a warrant where there is a reasonable belief that the premises have been or are being burglarized in order to secure the premises and to search for suspects and victims. *People v. Berow*, 688 P.2d 1123 (Colo.1984); *Commonwealth v. Fiore*, 9 Mass.App. 618, 403 N.E.2d 953 (1980), *cert. denied*, 449 U.S. 938, 101 S.Ct. 336, 66 L.Ed.2d 160; *State ex rel. Zander v. District Court*, 180 Mont. 548, 591 P.2d 656 (1979). *See also* W.LaFave, *supra*, § 6.6. Any search justified under the emergency doctrine, however, is limited by the nature of the emergency; an emergency cannot be used to support a general exploratory search. *People v. Reynolds*, 672 P.2d 529 (Colo.1983); *People v. Roark*, 643 P.2d 756 (Colo.1982). Where police officers are legitimately on the premises under the emergency doctrine, they may seize incriminating evidence discovered in plain view. *People v. Reynolds; People v. Clements*, 661 P.2d 267 (Colo.1983). By the same token police officers are entitled to rely on observations of things in plain view during

the course of a valid search under the emergency doctrine.

Here there is no question that the warrantless entry by the police into the defendant's house was justified by a reasonable belief that the house recently had been burglarized. More problematic is the significance of the fact that at some point after entering the house Detective Turner may have expanded his search beyond the bounds established by the emergency doctrine. Unlike the searches involved in *People v. Berow* and *State ex rel. Zander v. District Court*, the search in this case was not confined to "areas where a person could conceivably hide," *People v. Berow*, 688 P.2d at 1128: Detective Turner testified that during the course of the search he opened dresser drawers as well as closets.

■ The defendant asserts that by opening drawers Detective Turner tainted the entire search after the initial entry into the house. The People suggest that only the portion of the search occurring after the drawers were opened was invalid.[11] In our view, neither of these positions gives sufficient weight to the fact that Detective Turner's observation of the paraphernalia was not the product of the arguably overbroad aspects of the search. Rather, Detective Turner observed the paraphernalia in plain view in an area that he was justified in searching under the emergency doctrine. Under the circumstances of this case, the exclusion of the scales, spoons, mirror and playing card from the calculation of reasonable suspicion is not required.

The defendant advances other reasons why the facts of this case do not provide a basis for a reasonable suspicion that his safe contained drugs. He points out that the white coating on the items found in the basement was not chemically analyzed and that Detective Turner did not recognize immediately the significance of the items as cocaine paraphernalia. The defendant also notes that at the time the burglar made his statement about the contents of the safe to Turner the detective did not give the statement much credence. Final-

ly, the defendant notes that the card taken from the vice bureau files was two years old and contained inaccurate information.

■ It may well be that any of the facts discussed above, taken in isolation, would be an insufficient foundation for a reasonable suspicion that drugs were in the defendant's safe, but it is apparent from the record that Detective Turner's suspicion concerning the safe resulted from the combination of these facts. In view of the totality of the facts, the inference drawn by Detective Turner was reasonable. Accordingly, we uphold the district court's ruling that the officers had adequate suspicion to justify submitting the safe to a dog sniff.

### IV.

■ The defendant next argues that the affidavit in support of the warrant to search his safe contained information that must be stricken and that without this information the affidavit is insufficient to establish probable cause for issuance of a warrant to open the safe. We already have determined that Detective Turner's observation of the scales, spoons and playing card was the result of a lawful search and that the safe properly was submitted to a dog sniff. Therefore, information concerning these events was appropriately included in the affidavit. Additionally, the defendant contends that references in the affidavit to the statement made by the burglar to Detective Turner and to the police file card were misleading or flawed by material omissions. In *People v. Ellis*, 189 Colo. 242, 245, 539 P.2d 132, 135 (1975), we held that "[a]ny statement included in an affidavit for a search warrant known to the affiant to be false, inaccurate or misleading must be stricken and cannot be considered in determining whether the substance of the affidavit justified the issuance of a search warrant." Here, the burglar denied making any statement to Detective Turner about the contents of the defendant's safe. However, Detective Turner testified under

11. The record does not indicate when in the course of the search the drawers were opened.

oath that the burglar told him that he thought the safe might contain drugs. Thus there is sufficient evidence in the record to support the detective's inclusion of the burglar's statement in the affidavit. This statement as recounted in the affidavit was to the effect that the burglar told Detective Turner that he *knew* rather than *thought* the safe contained money and drugs. However, there is no indication in the record that this discrepancy in the description of the hearsay statement was the result of a deliberate attempt on the part of Detective Turner to influence the magistrate's determination of probable cause by providing false information. Further, the difference between the version of the statement testified to by Detective Turner and the statement recounted in the affidavit, for purposes of establishing probable cause, is insignificant.

 The defendant also characterizes as a material omission the failure to include in the affidavit the facts that 1) the vice bureau file card had not been updated for two years and 2) the card gave the address of Darrell Norman Unruh as 1050 South Columbine. In *People v. Winden*, 689 P.2d 578, 583 (Colo.1984), we stated that an omitted fact was material for purposes of vitiating an entire affidavit "only if its omission rendered the affidavit substantially misleading to the judge who issued the warrant." *See also People v. Kurland*, 28 Cal.3d 376, 618 P.2d 213, 168 Cal.Rptr. 667 (1980), *cert. denied* 451 U.S. 987, 101 S.Ct. 2321, 68 L.Ed.2d 844 (1981). By the same token, omission of facts relative to a statement in an affidavit should require striking the statement only if the statement is substantially misleading without the missing facts. In our consideration, omission of the facts pertaining to the file card do not meet this test of materiality. We decline to strike any of the information contained in the affidavit.

V.

 The defendant's final argument is that even if all the information in the affidavit is retained the affidavit did not establish probable cause to open and search the safe. An affidavit supporting a search warrant establishes probable cause for the issuance of a warrant if it alleges sufficient facts for a person of reasonable caution to believe that contraband or material evidence is located in the place to be searched. *People v. Conwell*, 649 P.2d 1099, 1101 (Colo.1982). Further, probable cause depends upon probabilities, not certainties, and upon knowledge grounded in the practical considerations of every day life on which reasonable and prudent persons act. *People v. Chase*, 675 P.2d 315, 317 (Colo. 1984); *People v. McFall*, 672 P.2d 534, 538–39 (Colo.1983); *Conwell*, 649 P.2d 1100–01. Finally, in resolving questions about probable cause a court must interpret the affidavit in a common sense and realistic fashion without imposing technical requirements of elaborate specificity. *People v. Chase*, 675 P.2d at 317; *People v. Conwell*, 649 P.2d at 1101–02.

 The primary focus of the defendant's challenge to the affidavit is the paragraph pertaining to the exposure of the safe to the narcotics detection dog. That paragraph reads as follows:

On September 30, 1981 at 12:30 p.m. Det.Sanchez, Det.Scanlan, and Officer W. Schell 68–100 responded to the Custodians Office with a Narcotics sniffing dog "Nick", and upon doing so the dog was brought to the room where the same safe was along with other items in the room and the dog immediately responded to the safe and pawed at it. The dog was then taken from the room and brought back and he immediately went to the same safe again. This dog "Nick", has had one and half years service in the Narcotic detection with three confirmed hits on drugs. The drugs were Cocaine and Hashish. The dog has continuous training of a minimum of one hour a day involving Narcotics detection.

The defendant contends that the affidavit fails to indicate the source of the information about the dog, provides an inadequate description of the dog's training and success in predicting the presence of drugs,

and does not explain the significance of the dog's reaction to the safe.

We agree with the People that a magistrate legitimately could infer from the affidavit that the source of Turner's information about the dog was a fellow officer. *Cf. People v. Turner*, 660 P.2d 1284 (Colo. 1983). We also agree with the People that the description of the dog's training and accuracy in the affidavit was sufficient to permit the magistrate to independently assess the dog's reliability. Other courts have concluded that similar statements about the qualifications of narcotics detection dogs supplied an adequate basis for a finding of probable cause. *See, e.g., United States v. Sentovich*, 677 F.2d 834, 838 n. 8 (11th Cir.1982) (dictum); *United States v. Klein*, 626 F.2d 22, 27 (7th Cir.1980); *United States v. Venema*, 563 F.2d 1003, 1007 (10th Cir.1977); *United States v. Meyer*, 536 F.2d 963 (1st Cir.1976); *United States v. Watson*, 551 F.Supp. 1123 (D.D.C.1982). Requiring "a formal recitation of a police dog's *curriculum vitae*," *United States v. Watson*, 551 F.Supp. at 1127, could lead to endless challenges to the facial sufficiency of affidavits based on the failure to include in minute detail information of dubious value about the background of the dog involved. For much the same reason we reject the assertion that common sense is incapable of supplying the connection between the dog's reaction to the safe, as described in the affidavit, and the inference that the safe contained drugs.

We conclude that the affidavit, read as a whole, established probable cause to issue the warrant to search the defendant's safe.

Judgment affirmed.

ROVIRA, J., specially concurs, and ERICKSON, J., joins in the special concurrence.

ROVIRA, Justice, specially concurring:

I disagree with the majority's conclusion that the dog sniff in this case constituted a search.

As the majority points out, the beginning point in analyzing the constitutionality of the canine sniff is *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). *Katz* established a two-prong analysis for testing the validity of investigative techniques under the fourth amendment. Under *Katz*, it must first be decided whether the activity was a search; if it was a search, it must then be determined whether the search was reasonable. The facts of this case, in addition to the overwhelming applicable case law, lead me to conclude that the sniff of Unruh's safe was not a search, and that the police conduct at all times was reasonable.

In determining whether the sniff was a search, it is necessary to decide whether the defendant had a reasonable expectation of privacy in the object of the police investigation. Before answering this question, however, a brief recitation of the facts is necessary. The object of the police investigation in this case was defendant's safe, initially discovered by the police in the open trunk of a car parked on a public street. The safe had been recently stolen from the defendant's nearby home. Before removing the safe to the police station for evidentiary purposes, the police were informed by one of the suspected burglars of the safe that it contained money and drugs. A search of the defendant's house revealed drug paraphernalia. The police also learned that the defendant was a suspected cocaine dealer. It is also significant that the defendant did not request the return of the safe after the police took custody of it. Cognizant of these facts, the detectives decided to submit the safe to a dog sniff. The dog's reaction to the safe indicated that it contained drugs.

The question under *Katz*, in determining whether the sniff of the safe constituted a search, is whether the defendant exhibited an actual expectation of privacy in the safe and, if so, whether the expectation is one "that society is willing to recognize as 'reasonable.'" *Katz*, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). In applying this analysis, it is reasonable to conclude that the defendant did not exhibit an actual expectation of privacy in the safe. This

conclusion is supported by the fact that "there is no indication in the record that the defendant ever directly requested the return of the safe after the police took custody of it in a lawful manner." Majority op. at 374. However, conceding that the defendant did exhibit an actual or "subjective" expectation of privacy in the safe, I am convinced that the expectation is not one that society is prepared to recognize as reasonable.

The luggage sniff cases contain helpful reasoning which applies equally well to this case. The leading case involving a dog sniff of luggage is *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). In *Place*, the defendant was a suspected drug courier who had his luggage detained for 90 minutes by members of the Drug Enforcement Administration. During this time, the D.E.A. agents transported the luggage to another location to be examined by a detector dog. The sniff indicated drugs, and the defendant was subsequently convicted of possession of narcotics. On review, the Supreme Court, while holding that the seizure of defendant's luggage was unreasonable under the fourth amendment due to the duration of its detention, also held that the sniff of the luggage was not a search. *Id.* at 707, 103 S.Ct. at 2644.

The majority quotes at length from *Place* and correctly identifies "the peculiarly nonintrusive and discriminating nature of an investigatory dog sniff," as the underlying rationale for holding a sniff not to be a search. Majority op. at 375–376. Yet, the majority reasons that the defendant "could have [had] no expectation that the privacy provided by a locked safe in his basement would be subject to a governmental investigative technique of any sort." Majority op. at 378. The locked safe, however, was not in the defendant's basement at the time of the dog sniff—it was at the police station. The defendant did not demand the return of the safe, nor did he object to the safe being in the temporary custody of the police. Hence, I believe that the rationale of *Place* applies with equal force to the facts of this case

and, accordingly, that the majority errs in concluding that the sniff was a search.

In support of its holding that the sniff was a search, the majority cites the "small minority" of cases holding that a dog sniff of an object constitutes a search. *See* majority op. at 376 n. 9. However, all but one of these cases were decided prior to *Place*, which was decided in 1983. This "small minority" of courts is actually smaller than the majority opinion suggests. First, *United States v. Beale*, 674 F.2d 1327 (9th Cir.1982), *vacated and remanded*, 463 U.S. 1202, 103 S.Ct. 3529, 77 L.Ed.2d 1382 (1983), *rev'd on rehearing*, 736 F.2d 1289 (1984), *cert. denied*, — U.S. —, 105 S.Ct. 565, 83 L.Ed.2d 506, provides no support at all for the proposition that a sniff of an object is a search. In *Beale*, the Ninth Circuit originally held that a sniff of luggage constituted a limited fourth amendment intrusion, but that decision was vacated by the Supreme Court in light of *Place*. On remand, the Ninth Circuit held that the canine sniff was not a search under the fourth amendment. Similarly, *United States v. Solis*, 393 F.Supp. 325 (C.D.Cal.1975), *rev'd*, 536 F.2d 880 (9th Cir.1976), provides no support for the majority's conclusion because the district court decision was reversed by the court of appeals, which held that a dog sniff of a trailer suspected of containing marijuana was not a search.

*People v. Evans*, 65 Cal.App.3d 924, 134 Cal.Rptr. 436 (1977), is also of dubious value. *Evans* is factually distinguishable on the ground that the dog sniff apparently was conducted as part of a general, exploratory search. There, the court stated:

It does affirmatively appear that the dogs were used to sniff around all of the [storage] compartments and that their use so far as the record is concerned appears to have been a seeking out and exploratory in nature. A review of the cases supports the conclusion that such a search with canines conducted without some preknowledge or reasonably strong suspicion that contraband is to be found in a particular location is a constitutionally impermissible invasion of the suspects' reasonable expectations of privacy and

consequently a violation of the Fourth Amendment.

*Evans*, 134 Cal.Rptr. at 441. In the instant case, however, the police did have a reasonable suspicion or some preknowledge of the safe's contents: the burglary suspect told the police the safe contained drugs, cocaine paraphernalia was found in the defendant's house, and police files indicated that defendant was a suspected drug dealer.

*Pooley v. State*, 705 P.2d 1293 (Alaska App.1985), is the only state court since *Place* to hold that a sniff of luggage constitutes a search. However, the sniff in *Pooley* was held to be a minimally intrusive search under the Alaska Constitution. The Alaska court did not hold that the sniff constituted a search under the fourth amendment of the United States Constitution. *Id.* at 1311.

The cases cited by the majority involving the use of trained dogs to sniff students have no bearing on this case whatsoever. Here, the dogs sniffed a safe, not a person.

In effect, the majority cites only one case which still stands for the proposition that a sniff of an object constitutes a fourth amendment search, *State v. Elkins*, 47 Ohio App.2d 307, 354 N.E.2d 716 (1976). This single state appellate court decision, decided prior to *Place*, hardly provides a sound basis for holding a sniff of an object to be a search. The persuasiveness of the majority's conclusion is further diminished in light of the cases which, since *Place*, have decided whether a sniff of an object is a search. Since *Place*, federal and state courts have unanimously agreed that a dog sniff of an inanimate object found in a public place does not constitute a search under the fourth amendment. *See, e.g., United States v. Dicesare*, 765 F.2d 890, 897 (9th Cir.1985) (canine's sniff of car trunk was not a "search" requiring probable cause), *amended by* 777 F.2d 543; *People v. Salih*, 173 Cal.App.3d 1009, 219 Cal. Rptr. 603, 606 (1985) ("It is now settled that exposing personal property to the sniff of a trained narcotics detecting dog is not a 'search' for Fourth Amendment purposes."); *State v. Snitkin*, 681 P.2d 980, 983 (Hawaii 1984) (detection dog's sniff of

a package was not a fourth amendment search); *Strout v. State*, 688 S.W.2d 188, 191 (Tex.Crim.App.1985) (dog's sniffing in the aisle in front of defendant's safety deposit boxes was not a fourth amendment search because defendant did not have a legitimate expectation of privacy in the aisle in front of his boxes).

The facts of the instant case and the majority's analysis present no convincing reason to depart from the rule established in *Place* and consistently followed by other courts. Accordingly, I respectfully dissent from that portion of part III of the majority opinion that holds the sniff to be a search.

I am authorized to say that Justice ERICKSON joins me in this special concurrence.